```
 1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF MISSISSIPPI
 2                        GREENVILLE DIVISION

 3
     UNITED STATES OF AMERICA                        PLAINTIFF
 4

 5
     VS.                                   NO. 4:20CR071
 6

 7
     ANTOINE BRYANT, SR.                             DEFENDANT
 8

 9

10          HEARING ON MOTION TO SUPPRESS EVIDENCE

11
            BEFORE HONORABLE NEAL B. BIGGERS, JR.
12              UNITED STATES DISTRICT JUDGE

13
                    Oxford, Mississippi
14                    May 17, 2021

15

16
     APPEARANCES:
17
     For the Government:  ROBERT J. MIMS, Esquire
18                        U.S. Attorney's Office
                          900 Jefferson Avenue
19                        Oxford, Mississippi  38655

20
     For the Defendant:   MERRILL K. NORDSTROM, Esquire
21                        Federal Public Defender's Office
                          1200 Jefferson Avenue, Suite 100
22                        Oxford, Mississippi 38655

23
     Court Reporter:      PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
24                        Federal Official Court Reporter
                          911 Jackson Avenue East
25                        Oxford, MS  38655
```

## TABLE OF CONTENTS

PAGE

DEFENDANT'S WITNESSES

  JOHNATHAN DANE WEST

      Direct Examination by Ms. Nordstrom     6
      Cross-Examination by Mr. Mims     41
      Redirect Examination by Ms. Nordstrom     49

  MICHAEL PREWITT

      Direct Examination by Ms. Nordstrom     51
      Cross-Examination by Mr. Mims     71
      Redirect Examination by Ms. Nordstrom     74

DEFENDANT'S EXHIBITS     ADMITTED

    D-1     20
    D-2     24
    D-3     31
    D-4     41

1    (CALL TO ORDER OF THE COURT AT 3:10 P.M.)

2    **THE COURT:**  Good morning.

3    **MR. MIMS:**  Good afternoon, Judge.

4    **THE COURT:**  We have this matter of a search warrant --

5    this is -- that counselor wishes to argue.  And we had -- this

6    morning earlier, we had some sentencings and pleas.  Mr. Mims

7    knows this.  Of course, he was here for one of them.

8         And it worked out pretty good as far as social

9    distancing was concerned because the sound system seems to be

10   much better than it used to be.  It should.  They spent $50,000

11   on it, but -- so I think we can have the defendant, the

12   witnesses in the courtroom, and I can hear them from the table.

13   Those microphones at the table sound okay.

14        If we have any trouble with it, we'll let the witness

15   come up here or come to the podium.  And the lawyers can do

16   what you want as far as distancing is concerned.

17        So, Ms. Nordstrom, this is your motion.  So are you

18   ready to proceed?

19   **MS. NORDSTROM:**  I am, Your Honor.

20   **THE COURT:**  Okay.  Mr. Mims, you're representing the

21   government.  Are you ready to proceed?

22   **MR. MIMS:**  Yes, sir, Your Honor.

23   **THE COURT:**  All right.

24        All right.  And, Ms. Nordstrom, you have -- do you

25   wish to make any kind of an opening on it, or do you want to

1  just -- just tell me briefly what you -- your issue with this
2  is.

3         **MS. NORDSTROM:**  Thank you, Your Honor.

4         The issue in this case is whether a no-knock search
5  warrant was reasonable under the circumstances, the probable
6  cause that was presented to the municipal court judge who
7  granted the search warrant.  And that's basically it in a
8  nutshell.

9         **THE COURT:**  Whether there was sufficient probable
10  cause?

11         **MS. NORDSTROM:**  Correct, for the no-knock portion of
12  the search warrant.

13         **THE COURT:**  Well, for the no-knock portion?

14         **MS. NORDSTROM:**  Correct.  It's our position that the
15  Supreme Court requires a higher threshold for the issuance of a
16  no-knock search warrant, and it's our position that that was
17  not met.

18         **THE COURT:**  Okay.  Was there another part that you do
19  not have issue with?  Is that it?

20         **MS. NORDSTROM:**  That is.  That's the crux of the
21  motion, Your Honor.

22         **THE COURT:**  Okay.  What did they present to the city
23  judge down there as probable cause?

24         **MS. NORDSTROM:**  There were six specific facts that
25  were presented to the magistrate judge stating that --

1       **THE COURT:** Now, wait a minute. What judge did they
2 present it to?

3       **MS. NORDSTROM:** I'm sorry. It was a municipal court
4 judge, Your Honor, in Greenville.

5       **THE COURT:** City judge. Okay.

6       **MS. NORDSTROM:** Yes, sir. The underlying facts and
7 circumstances state that a confidential informant advised that
8 he or she could purchase drugs and guns from Mr. Bryant, my
9 client; that Mr. Bryant is affiliated -- this is from the
10 confidential informant is my understanding -- that Mr. Bryant
11 is affiliated with an individual by the name of Willie Diggins,
12 who alledgedly sells drugs on 4th Street; that Mr. Bryant sells
13 marijuana, cocaine, and firearms from his residence; that the
14 confidential informant has seen Mr. Bryant in possession of
15 handguns that were allegedly for sale; and that the
16 confidential informant has advised Mr. Bryant was a convicted
17 felon; and that the confidential informant participated in a
18 controlled buy for marijuana, says between June 9, 2019, and
19 June 11th, 2019.

20       **THE COURT:** Okay. You want to call your -- are you
21 ready to call your first witness?

22       **MS. NORDSTROM:** I am, Your Honor. I'd call
23 Investigator West.

24       **THE COURT:** You got that, Charlie?

25       **COURT SECURITY OFFICER:** No, Your Honor. What's the

1  name?

2  **MS. NORDSTROM:**  Johnathan West.

3  (CONFERRING OFF THE RECORD.)

4  **MS. NORDSTROM:**  Judge, do you want me to stay here, or

5  do you want me to --

6  **THE COURT:**  Well, let's try it -- let's try it first

7  with you standing by the podium.

8  **MS. NORDSTROM:**  Okay.  Certainly.

9  (CONFERRING OFF THE RECORD.)

10  (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

11  **THE COURT:**  Have a seat.

12  **COURTROOM DEPUTY:**  Would you state and spell your

13  first and last name for the record, please?

14  **THE WITNESS:**  Johnathan Dane West.  J-o-h-n-a-t-h-a-n.

15  Dane, D-a-n-e.  West, W-e-s-t.

16  **MS. NORDSTROM:**  May I remove my mask from here?

17  **THE COURT:**  Sure.  Yes, I think that's good.

18  **MS. NORDSTROM:**  It might be easier for people.  And I

19  believe you can too, Mr. West.

20  **JOHNATHAN DANE WEST, DEFENDANT'S WITNESS, AFTER BEING**

21  **DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

22  **DIRECT EXAMINATION**

23  **BY MS. NORDSTROM:**

24  **Q.**  Good afternoon.  My name is Merrill Nordstrom, and I

25  represent Antoine Bryant in this matter, and I have just a few

1  questions for you.  Can you state your name and occupation for

2  the record?

3  **A.**    Johnathan Dane West, and I work for the Greenville Police

4  Department in Greenville, Mississippi.

5  **Q.**    And what is your position with Greenville Police

6  Department?

7  **A.**    I'm currently sergeant in the criminal investigations

8  division.

9  **Q.**    Okay.  And have you reviewed anything in preparation for

10  your -- this hearing today?

11  **A.**    Yes.

12  **Q.**    Okay.  What have you reviewed?

13  **A.**    A case that was initiated in 2019.

14  **Q.**    Okay.  All right.  So your case file, your investigation

15  report?

16  **A.**    Yes, ma'am.

17  **Q.**    Okay.  Anything else that you've reviewed?

18  **A.**    I -- just the case file --

19  **Q.**    Okay.

20  **A.**    -- for this case.

21  **Q.**    All right.  And have you spoken to anybody about your

22  testimony here today?

23  **A.**    Just on the way up here, I spoke with the prosecutor in

24  reference to where -- if I would be inside of the courtroom or

25  not.

1  **Q.**  Okay.  Have you spoken to Judge Prewitt at all about your
2  testimony?

3  **A.**  I've spoken to Judge Prewitt but not about the testimony.

4  **Q.**  Okay.  All right.  Have you spoken to Judge Prewitt about
5  this case?

6  **A.**  I don't -- I don't know if I talked to him about the
7  case, but I mean -- no.  No.  I didn't talk to him about the
8  case.

9  **Q.**  Okay.  Let's go through -- so you said you're a sergeant
10  in the criminal division at Greenville?

11  **A.**  Yes, ma'am.  Currently, I'm the sergeant in the criminal
12  investigations division.

13  **Q.**  All right.  Tell us -- go through and tell us about your
14  training as -- with your work at Greenville Police Department.

15  **A.**  Well, in 2019, I was working in the narcotics division,
16  so I was a narcotics investigator at the time of this case.

17  **Q.**  Okay.  All right.  And what was your training for that
18  position?

19  **A.**  We went to training about three times a year.  We -- I
20  came to the division in 2015.

21  **Q.**  Okay.

22  **A.**  I think I ended up with, like, close to 400 credit hours
23  in training throughout the time that I was in the division.

24  **Q.**  And I was just looking at your affidavit for the search
25  warrant we're talking about here today.  Did -- it said

1    something about that you received schooling at Mississippi

2    Delta Community College and law enforcement training academy;

3    is that correct?

4    **A.**    That's where I got my associate's, and I went to the

5    police academy.

6    **Q.**    Okay.  And it says here that -- in the affidavit that

7    you're a certified law enforcement officer; is that right?

8    **A.**    Yes.

9    **Q.**    What does certified mean?

10    **A.**    I have the credentials to be a law enforcement officer in

11    the state of Mississippi.

12    **Q.**    And did your training with the academy -- and you said

13    you got 400 hours a year in training or something?

14    **A.**    Yeah, just altogether.  Sorry.  I didn't mean to cut you

15    off.

16    **Q.**    That's okay.  Did you have any training in what's

17    required for applying for a search warrant?

18    **A.**    Yes.

19    **Q.**    Okay.  What is your understanding of what is required for

20    applying for a search warrant?

21    **A.**    Enough probable cause to influence the judge to say that

22    there's enough in that affidavit to grant us permission to make

23    entry into someone's house and detain them and then search for

24    evidence inside their residence or business or whatever

25    dwelling it is.

1  **Q.**  Okay.  And when you make this application to a judge,
2  does it have to be under oath?
3  **A.**  Yes.
4  **Q.**  Okay.  And it states also in your affidavit for the
5  search warrant that you have written many search warrants for
6  narcotics; is that right?
7  **A.**  Yes.
8  **Q.**  Okay.  And you're not -- are you still doing narcotics
9  investigations or is --
10 **A.**  No, ma'am.  In, I believe, September or October of last
11 year, I transferred to the criminal investigations division.
12 **Q.**  I'm just curious.  But why?
13 **A.**  I just wanted to see a different side of investigations.
14 **Q.**  I got you.  Okay.  So tell me, in your training, what is
15 required for a no-knock search warrant?
16 **A.**  I know that there's different reasons why you could get a
17 no-knock search warrant.  One would be if there's a risk to the
18 safety of the officers that are conducting the search warrant
19 or if there was a risk for destruction of evidence.
20 **Q.**  Okay.
21 **A.**  Just, I mean, different things that would lead us to want
22 to get to a person before they had the means of doing something
23 that would disrupt the case or the safety of us.
24 **Q.**  Okay.  And what is -- when you have a regular search
25 warrant, how do you conduct a regular search warrant?

1 **A.** Well, I guess you would say a knock and announce search

2 warrant where we would knock on the door and announce that

3 we're the police and tell them that they need to come to the

4 door and that we have a search warrant.

5 **Q.** Okay.

6 **A.** I know that there's different stipulations with that.

7 There's, like, a reasonable time frame for us to make entry if

8 they don't come to the door, but I know that, you know, we

9 can't just approach the house and announce "police" and knock

10 their door in.

11 **Q.** Okay. And that gets me to -- so what -- tell me about --

12 how do you conduct a no-knock search warrant?

13 **A.** Well, we would come to the residence with an officer

14 presence that would be safe for us and approach the residence.

15 And whenever we get to the door, then we would try to make our

16 way into the residence as fast as possible while announcing

17 that we're the police and let them know that it's police

18 officers that are coming into the house.

19 **Q.** Okay. So you break their door; is that correct?

20 **A.** We force our way into the residence.

21 **Q.** Okay. By breaking their door?

22 **A.** Sometimes. I mean, maybe not breaking the door, but

23 forcing the door open, I guess would be a better term to say.

24 **Q.** Okay. Talk to me about your process that you use for

25 requesting a search warrant. Like, how -- just the nuts and

1    bolts of it.  Do you draft your own affidavit?  Do you draft

2    the search warrant?  Tell me what your process is.

3    **A.**    I guess I really don't understand your question.

4    **Q.**    Okay.  All right.  I'll just -- do you draft the

5    affidavit for the search warrant?

6    **A.**    Like as in Johnathan West?

7    **Q.**    As in Johnathan West on the search warrant.

8    **A.**    Yes, ma'am.

9    **Q.**    You draft it up?

10   **A.**    Yes, ma'am.

11   **Q.**    Okay.  And then do you also draft the search warrant

12   itself?

13   **A.**    Yes, ma'am.

14   **Q.**    Okay.  And then do you meet with a judge?

15   **A.**    Yes, ma'am.

16   **Q.**    Okay.  And what judge do you typically meet with?

17   **A.**    Typically, we would meet with Judge Prewitt.  He's the

18   municipal judge for Greenville.

19   **Q.**    Okay.  And you meet with him in person, or do you do it

20   on the phone or what?

21   **A.**    We meet with him in person.

22   **Q.**    Okay.  And then is anyone else in the room when you're

23   meeting with Judge Prewitt?

24   **A.**    Sometimes, but not every time.

25   **Q.**    Okay.  Is it recorded?

1  **A.**   No, it's not recorded.

2  **Q.**   All right.  And do you -- are you -- who puts you under

3  oath?

4  **A.**   It would be Judge Prewitt.

5  **Q.**   Okay.  So he swears you in?

6  **A.**   Typically.

7  **Q.**   Typically.  Sometimes he doesn't?

8  **A.**   I don't know if --

9          **THE COURT:**  Ms. Nordstrom, to kind of speed things up,

10 why don't we question this witness based on what happened, what

11 he saw happened.

12         **MS. NORDSTROM:**  Okay.

13         **THE COURT:**  I mean, you're talking about what their

14 policies are, and that's fine, but I'm more interested in what

15 happened in this case.

16         **MS. NORDSTROM:**  Certainly.

17 **BY MS. NORDSTROM:**

18 **Q.**   Okay.  Well, we'll move on.  And will you tell me about

19 what happened on June 10th, 2019?  Do you remember?  This is

20 before the raid of June 17th.  What happened on June 10th,

21 which is all put in your -- some of it is put in your affidavit

22 for the search warrant?  So I guess what I'm asking is, what --

23 what's the probable cause that you placed in the affidavit, and

24 how did you come to that information?

25 **A.**   Well, on or around June the 10th, I would say we

1  conducted a buy walk with a confidential informant.

2  **Q.**   You conducted a what now?

3  **A.**   A buy walk.

4  **Q.**   A buy walk.  What is that?

5  **A.**   It's a controlled buy where we have a confidential

6  informant, and this person would advise us that they have dealt

7  with whatever subject that would be before and that they have

8  the means of doing some sort of business with them or being

9  able to be around them during some business.  And I guess on

10 this occurrence, this informant had known that he could buy

11 drugs from Antoine Bryant.

12 **Q.**   Okay.

13        **MS. NORDSTROM:**  May I approach, Your Honor?

14        **THE COURT:**  Yes.

15 **BY MS. NORDSTROM:**

16 **Q.**   Mr. West, I'm going to hand you a document called Report

17 of Investigations.  Would you take a look at that for me?

18        **THE COURT:**  All right.  Ask him a question about it.

19        **MS. NORDSTROM:**  Okay.

20 **BY MS. NORDSTROM:**

21 **Q.**   Investigator West, do you recognize that document?

22 **A.**   Yes, ma'am.

23 **Q.**   Okay.  Did you draft it?

24 **A.**   I don't remember if I drafted this document or not.

25 **Q.**   Okay.  And what is this -- what does this document tell

1 us?

2 **A.** That on June the 10th the special operations division for

3 Greenville Police Department conducted a controlled buy.

4 **Q.** Okay. And how did that come about? Did you talk to the

5 confidential informant and ask him to make the call or -- and

6 ask him for the amount of drugs and all that kind of stuff, or

7 how did that come about?

8 **A.** I don't personally remember --

9 **Q.** Okay.

10 **A.** -- everything about the phone call. I just remember that

11 we made a phone call to Mr. Bryant that day.

12 **Q.** All right. Before you made the -- made the phone call,

13 what had this confidential informant told you he could get from

14 Mr. Bryant?

15 **A.** That he could buy cocaine from Mr. Bryant.

16 **Q.** All right. And what else? Anything else?

17 **A.** I believe that he would buy marijuana from him too.

18 **Q.** And anything else?

19 **A.** He said that he also sells guns, but the CI hadn't talked

20 about buying a gun from him at the time.

21 **Q.** Okay.

22 **A.** Just knew that he sold firearms.

23 **Q.** Okay. And based on that, a phone call was made to

24 allegedly my client; is that right?

25 **A.** Yes, ma'am.

1   **Q.**   And what was the agreement for?

2   **A.**   That he was going to buy cocaine from him.

3   **Q.**   Okay. Are you sure about that?

4   **A.**   Yes, ma'am.

5   **Q.**   Cocaine?

6   **A.**   I would believe cocaine. From my memory, it was cocaine.

7   **Q.**   And you've reviewed your report?

8   **A.**   I apologize. It was marijuana.

9   **Q.**   Okay.

10   **A.**   I'm looking at the report now. It was marijuana.

11   **Q.**   Okay. So this confidential informant tells you guys he

12   can buy marijuana, he can buy cocaine, and he can buy guns from

13   Mr. Bryant; is that right?

14   **A.**   I don't remember if the CI said that specifically he

15   could buy guns. I don't remember if he said he could or not.

16   I just know that he was aware that he did sell firearms.

17   **Q.**   Did you not put that in your affidavit, that you were

18   told by a confidential informant that you could buy guns from

19   Mr. Bryant?

20   **A.**   I would have to see what I wrote down in the affidavit.

21   **Q.**   Okay. We'll look at that in just a minute. Did -- but

22   the sale that -- or the agreement that was made was to purchase

23   what?

24   **A.**   Marijuana.

25   **Q.**   And how much marijuana?

1  **A.**    In my report, I have that he purchased $10 worth of
2  marijuana from him.

3  **Q.**    So less than a gram?

4  **A.**    I don't remember the exact amount that we bought from
5  him.

6  **Q.**    Okay.  Well --

7  **A.**    But he left with $10, and he made a purchase from him and
8  came back with a --

9  **Q.**    I believe your report says 0.87 grams of marijuana.

10  **A.**    Yes, ma'am.  It says on the report that it was
11  0.87 grams.

12  **Q.**    And you're a law enforcement officer.  How much marijuana
13  is a misdemeanor?

14  **A.**    Less than an ounce.

15  **Q.**    Less than 30 grams?

16  **A.**    Yes, ma'am.

17  **Q.**    Okay.  And this is less than one gram?

18  **A.**    Yes, ma'am.

19  **Q.**    So this is a misdemeanor amount of marijuana?

20  **A.**    He purchased a misdemeanor amount of marijuana from him.

21  **Q.**    Okay.  Now, so the CI says you can buy cocaine, you can
22  buy marijuana, you can buy guns from Mr. Bryant, and yet the
23  only sale that y'all orchestrated was one for a misdemeanor
24  tiny amount of marijuana.  Why is that?

25  **A.**    Because we weren't prosecuting the sale.  We were just

1    wanting to get probable cause to get a search warrant.

2    **Q.**   But that was your probable cause for the search warrant

3    is the -- I mean, I don't understand that.  You're --

4    **A.**   It wasn't -- we weren't prosecuting the drugs that we

5    bought from him that day, so we chose to not spend a lot of

6    money on the buy.

7    **Q.**   What were you prosecuting Mr. Bryant for?

8    **A.**   We were going to serve a search warrant and obtain

9    evidence from the search warrant.

10   **Q.**   But you -- what's your probable cause for other evidence

11   for criminal activity?  You just wanted to go look for the hell

12   of it?

13   **A.**   I guess I'm not following your question.

14   **Q.**   I'm not following what you're saying.  You're telling me

15   that you wanted to get in his house.  Why did you want to get

16   in his house?

17   **A.**   Because our confidential informant advised us that he

18   sells narcotics out of his house.

19   **Q.**   Okay.  And you didn't think to, like, let's get a sale of

20   cocaine, let's get a sale of a felony amount of marijuana?

21   **A.**   Well, the way that we saw it was that we were just going

22   to try to get probable cause to get a search warrant for his

23   house, so that's why we chose to do a buy walk.

24   **Q.**   Uh-huh.  All right.

25   **A.**   We weren't -- we weren't prosecuting that sale from that

1  day.

2  **Q.**  Okay.  Let's just get the nuts and bolts.  What in your

3  investigation of Mr. Bryant led you to request and get a

4  no-knock search warrant?

5  **A.**  That Mr. Bryant sells narcotics out of his house and he

6  also sells guns out of his house.

7  **Q.**  And that selling of guns, you did not do any independent

8  investigation to determine -- to corroborate this confidential

9  informant telling you this?

10  **A.**  I don't remember if we did any background checks on him.

11  **Q.**  Okay.  But you never even requested this CI to go

12  purchase a gun from Mr. Bryant, did you?

13  **A.**  From my understanding, no, we didn't.

14  **Q.**  Okay.  So the basis of your no-knock request for a search

15  warrant is that there were drugs in the house, right?  Is that

16  correct?

17  **A.**  Yes.

18  **Q.**  And that there were guns in the house; is that correct?

19  **A.**  Yes.

20  **Q.**  And your only independent investigation of this was to

21  get this confidential informant to purchase less than a gram of

22  marijuana?

23  **A.**  Can you ask the question again?

24  **Q.**  Yeah.  So you're getting all this information from this

25  confidential informant, right?  The only independent

1 investigation that you did as an investigator was to get him to

2 go purchase $10 worth of marijuana; is that right?  That's it?

3 **A.**    From my understanding, yes.

4 **Q.**    What -- okay.  Let's take a look at your application

5 for -- your affidavit for a no-knock search warrant.

6          **MS. NORDSTROM:**  May I approach, Your Honor?

7          **THE COURT:**  You may.

8          **MS. NORDSTROM:**  And I'd ask that his report from

9 June 10th be admitted as D-1.

10         **THE COURT:**  Very well.

11         **MS. NORDSTROM:**  Thank you.

12     (EXHIBIT NO. D-1 ADMITTED INTO EVIDENCE.)

13 **BY MS. NORDSTROM:**

14 **Q.**    Investigator West, I just handed you -- and I'm going to

15 call you Investigator -- I'm sorry.  It's sergeant now.

16 **A.**    That's okay.

17 **Q.**    Okay.  I just handed you a document entitled "Affidavit

18 for No-Knock Search Warrant"; is that right?

19 **A.**    Yes, ma'am.

20 **Q.**    Okay.  So let's go through it.  If you can just review it

21 quickly.  You've probably already looked at it since you looked

22 at your report, but go ahead if you want to take a look at it

23 for a second.

24 **A.**    Of the whole affidavit?

25 **Q.**    Of the affidavit and the underlying facts and

1   circumstances attached to it.

2   **A.**   It's the affidavit that I drafted.

3   **Q.**   Okay.

4   **A.**   It describes the residence.  It describes things that we
5   believed would be in the residence.

6   **Q.**   All right.

7   **A.**   Why we believed that we would need to get a search
8   warrant for the residence.

9   **Q.**   All right.  And why you would also -- what in that
10  affidavit that you're holding right now talks about reasonable
11  suspicion of physical violence on law enforcement or, two, the
12  destruction of evidence?

13  **A.**   Firearms which may be used to protect drug proceeds.

14          **THE COURT:**  I can't hear you.

15          **THE WITNESS:**  I'm sorry.  Firearms which may be used
16  to protect drugs, drug proceeds, and drug trafficking
17  activities, including handguns, rifles, shotguns, automatic
18  weapons.

19          **THE COURT:**  Is that it?

20          **THE WITNESS:**  And in my underlying facts and
21  circumstances, I stated that Mr. Bryant -- he sells narcotics
22  and firearms from his residence.

23  **BY MS. NORDSTROM:**

24  **Q.**   And you got that information from whom?

25  **A.**   From the confidential informant.

1  **Q.**   Okay.  But you never requested the confidential informant
2  purchase a gun?

3  **A.**   No, ma'am.

4  **Q.**   Okay.  So, basically, because there's drugs -- we think
5  there are drugs in the home; therefore, there potentially are
6  firearms.  Is that the way you're justifying the no-knock?  Is
7  that what I'm understanding?

8  **A.**   And the informant advised that Mr. Bryant had firearms in
9  the residence.

10  **Q.**   Okay.  Did this confidential informant ever tell you when
11  he saw these firearms in the residence?

12  **A.**   I don't remember.

13  **Q.**   Okay.  Did -- and you didn't -- you didn't ask him to go
14  purchase a gun, right?  Right?

15  **A.**   No, ma'am.

16  **Q.**   Okay.  And did the CI ever -- confidential informant ever
17  say he saw Mr. Bryant -- say that Mr. Bryant always carried a
18  gun on his person?

19  **A.**   I don't remember.

20  **Q.**   Okay.  Did the confidential informant ever tell you that
21  Mr. Bryant threatened him?

22  **A.**   I don't remember if he told me that.

23  **Q.**   Okay.  Those would be important things, if he had told
24  you, to put in your investigation report, correct?

25  **A.**   That's correct.

1   **Q.**    Okay. And did you run a background check on Mr. Bryant?

2   **A.**    Ma'am?

3   **Q.**    Did you run a background check? Did you get an NCIC

4   report on Mr. Bryant before you requested the search warrant?

5   **A.**    I'm not -- I don't remember if we did or not.

6   **Q.**    Okay. Have you since run a background check on

7   Mr. Bryant?

8   **A.**    Yes, ma'am.

9   **Q.**    Okay. And is there anything on his criminal convictions

10   that indicate that he has a violent history?

11   **A.**    Not to my knowledge.

12   **Q.**    In fact, his last conviction before this arrest on

13   June 17th involved property crimes eight years ago; is that

14   right?

15   **A.**    For a burglary.

16   **Q.**    Huh?

17   **A.**    You're -- this is in reference to a burglary?

18   **Q.**    Yes.

19   **A.**    Yes, ma'am.

20   **Q.**    Okay. Like a commercial burglary type of situation.

21   Receiving stolen property, I think, is the right term; is that

22   correct?

23   **A.**    To my knowledge.

24   **Q.**    Okay.

25            **THE COURT**: It was what? It was what?

1    **MS. NORDSTROM:**  It was receiving stolen property eight
2    years ago.

3    **THE COURT:**  Receiving stolen property.

4    **A.**    From my understanding, it was something to do with a
5    vacant residence in Louisiana.

6    **BY MS. NORDSTROM:**

7    **Q.**    Okay.

8    **A.**    It was taking copper out of the walls and the ceilings.

9    **Q.**    Okay.  And that was how many years before your arrest
10   here?

11   **A.**    I'm not sure.

12   **Q.**    If I said eight, would that sound about right?

13   **A.**    That would probably be about the right time.

14   **Q.**    Okay.  So you meet -- you do this -- you meet with this
15   confidential informant.  He does the $10 for less than a gram
16   of marijuana sale on June 10th.  And then, according to your
17   affidavit, which I'd like to make --

18   **MS. NORDSTROM:**  I ask be made Exhibit D-2 to his
19   testimony.

20   **THE COURT:**  Very well.

21   **MS. NORDSTROM:**  Thank you.

22   (EXHIBIT NO. D-2 ADMITTED INTO EVIDENCE.)

23   **BY MS. NORDSTROM:**

24   **Q.**    You go sit down with who?

25   **A.**    I didn't hear what you said.

1 **Q.** Who did you meet with the next day? Do you remember?

2 Did you meet with Judge Prewitt the next day?

3 **A.** Yes, ma'am.

4 **Q.** And do you remember anything about your conversation with

5 Judge Prewitt about requesting this no-knock search warrant?

6 **A.** No, ma'am.

7 **Q.** Okay. Isn't it true, Investigator West -- Sergeant West,

8 that any time that drugs are alleged that you ask for a

9 no-knock search warrant?

10 **A.** I would say yes, usually.

11 **Q.** All right.

12 **A.** From my -- from my recollection, that's common for us to

13 request a no-knock search warrant.

14 **Q.** Okay. And you would agree that every time that you

15 request a no-knock search warrant Judge Prewitt grants it?

16 **A.** No, ma'am.

17 **Q.** That's not true?

18 **A.** Huh-uh.

19 **Q.** Okay. Give me an example of a time that he has not

20 granted a no-knock search warrant that you requested.

21 **A.** I couldn't give you an example. I just know that there

22 has been times where Judge Prewitt wouldn't sign affidavits for

23 us.

24 **Q.** Okay. You mentioned this confidential informant. In

25 fact, 90 percent of what you state in your -- for your probable

1  cause comes from the mouth of this confidential informant; is
2  that right?
3  **A.**   Yes, ma'am.
4  **Q.**   No independent investigation being conducted by you or
5  Mr. Daniels or Mr. McClinton regarding those allegations,
6  correct?
7  **A.**   I don't remember.  Not to my knowledge.
8  **Q.**   Okay.  And you put in the affidavit that this
9  confidential informant is reliable; is that right?
10 **A.**   Yes, ma'am.
11 **Q.**   Okay.  Have you used this confidential informant in the
12 past?
13 **A.**   Yes, ma'am.
14 **Q.**   Okay.  How many times?
15 **A.**   I couldn't tell you how many times, but, I mean, he was a
16 guy that we -- I personally dealt with for years.
17 **Q.**   Uh-huh.
18 **A.**   I mean, he was probably the longest running CI that I
19 had.
20 **Q.**   Okay.  So you started in 2016 in narcotics; is that
21 right?
22 **A.**   2015.
23 **Q.**   2015.  All right.  And this happened in 2019?
24 **A.**   Yes, ma'am.
25 **Q.**   Has he ever been wrong?

1    **A.**    I would --

2         **THE COURT:**   Are you thinking or you just hung up?

3         **THE WITNESS:**   I'm hung up.

4    **A.**    But I would say he's probably been wrong before.

5    **BY MS. NORDSTROM:**

6    **Q.**    Okay.

7    **A.**    Probably. I don't want to say he's never been wrong. I

8    don't want to say that.

9    **Q.**    In fact, when you searched Mr. Bryant's house, after you

10    knocked his door in, there was no cocaine, right?

11    **A.**    No, ma'am. We didn't -- on that day, there wasn't any

12    cocaine.

13    **Q.**    Uh-huh. And there was one gun; is that right?

14    **A.**    Yes, ma'am.

15    **Q.**    Okay. There was no baggies, right?

16    **A.**    No, ma'am.

17    **Q.**    No sign of drug trafficking, baggies?

18    **A.**    Just the containers that the marijuana was in.

19    **Q.**    Okay. And let's talk about those containers. Excuse me.

20    I'm holding up a Tylenol Extra Strength pill bottle. Is this

21    the containers you're talking about, the size?

22    **A.**    It wasn't that Tylenol bottle.

23    **Q.**    Oh, I know that. I'm talking about just -- when you say

24    containers, it could be, like, barrels, you know, or shipping

25    containers. So how big of containers are we talking about?

1    Are we talking about a pill bottle size?

2    **A.**    It was roughly that size.

3    **Q.**    And was anything in it?

4    **A.**    Residue.

5    **Q.**    Okay.  Of what?

6    **A.**    Marijuana.

7    **Q.**    Okay.  Any scales?

8    **A.**    Not that we found on that day.

9    **Q.**    Any money?  Currency?

10   **A.**    I don't remember.  I don't remember if we found any

11   currency.

12   **Q.**    Okay.  Any ledgers?

13   **A.**    Not to my knowledge.

14   **Q.**    Okay.  In fact, everything that you found would indicate

15   potentially personal use; is that right?

16   **A.**    I'm not sure.  I know that -- I'm not sure if it would be

17   personal use or not.  I know that a lot of times -- there

18   wasn't your typical baggies and scales and large amount of

19   money with small denominations.  I mean, I guess you could -- I

20   mean, some people would consider that a user amount, and some

21   people might consider that a seller's amount.

22   **Q.**    Uh-huh.  When you did the application for the search

23   warrant, you didn't put anything about -- in there about

24   Mr. Bryant's criminal history, did you?

25   **A.**    Not that I know of.

1 **Q.** Okay. You didn't put anything in there about the time of

2 when this alleged -- the CI allegedly saw guns in the house,

3 right?

4 **A.** No, ma'am.

5 **Q.** So we don't know when that was, right?

6 **A.** I don't remember.

7 **Q.** And it's important for your information to be

8 contemporaneous with when you execute a search warrant; is that

9 right? You were probably taught that in training, right?

10 **A.** I didn't hear your question.

11 **Q.** It's important for your information to be

12 contemporaneous, to be close to when you execute something; is

13 that not right?

14 **A.** Yes, ma'am.

15 **Q.** Okay. So you asked for a no-knock search warrant on June

16 the 11th of 2019, and when did you execute it?

17 **A.** I don't remember the exact dates.

18 **Q.** Okay. If I said June 17th, does that sound right?

19 **A.** If -- is that what it says on my report?

20 **Q.** (Nods head up and down.)

21 **A.** Then that should be right.

22 **Q.** In fact -- I tell you what, I should have done this. I'm

23 going to hand you --

24 **MS. NORDSTROM:** May I approach, Your Honor?

25 **THE COURT:** You may.

1  **BY MS. NORDSTROM:**

2  **Q.**    This is the search warrant.  Does that look familiar?

3        **MS. NORDSTROM:**  And I'd ask that the application for

4  the no-knock search warrant be made D-2 to this hearing.

5        **THE COURT:**  Let the clerk mark it.  What else do you

6  have of exhibits there that you --

7        **MS. NORDSTROM:**  I've got --

8        **THE COURT:**  I mean, do you have another one?

9        **MS. NORDSTROM:**  I've got the June 17, 2019 --

10        **THE COURT:**  Do you have another exhibit on the table

11  that you put up there while ago?

12        **MS. NORDSTROM:**  Yes, sir.  It's already been

13  previously marked.  It's the Report of Investigation.

14        **THE COURT:**  Okay.

15        **MS. NORDSTROM:**  Thank you.

16  **BY MS. NORDSTROM:**

17  **Q.**    Do you recognize that search warrant?

18  **A.**    Yes, ma'am.

19  **Q.**    Okay.  And do you remember the date when -- does that

20  date now, June 17th -- June 11th, ring a bell?

21  **A.**    Yes, ma'am.

22  **Q.**    Okay.  And you did not execute the warrant until when?

23  **A.**    I don't remember the exact date.

24        **MS. NORDSTROM:**  All right.  Your Honor, may I

25  approach?

1       **THE COURT:**  You may.

2       **MS. NORDSTROM:**  All right.  This is an investigatory

3   report from June 17th.

4       I would ask that this search warrant be made an

5   exhibit to this hearing.  Thank you.

6       (EXHIBIT NO. D-3 ADMITTED INTO EVIDENCE.)

7   **BY MS. NORDSTROM:**

8   **Q.**   If you want to review your report, it will tell you the

9   date you executed it.

10  **A.**   Yes, ma'am.  It's the 17th.

11  **Q.**   Okay.  Does it say what time of day you executed it?

12  **A.**   Approximately 7:29 a.m.

13  **Q.**   Okay.  And so you were given a search warrant on June the

14  11th, and then you execute it on June the 17th; is that right?

15  **A.**   Yes, ma'am.

16  **Q.**   So almost a week after getting the search warrant?

17  **A.**   Yes, ma'am.

18  **Q.**   Why did you wait so long?

19  **A.**   I don't remember why we decided to wait.

20  **Q.**   Okay.

21  **A.**   I know that a lot of times in the past we would wait to

22  find out a day that that person would possibly have more drugs

23  at their house, like, if they were going to re-up.  You know,

24  we would corroborate with our CI sometimes to get them to let

25  us know when that person maybe would have re-upped on their

1  product or something.

2  **Q.**  Okay.

3  **A.**  I mean, I don't remember specifically this incident why

4  we decided to wait, but, I mean, that would be one reason why

5  we would wait.

6  **Q.**  All right.  So explain to the Court what you remember

7  about breaking into Mr. Bryant's house.

8  **A.**  When we executed the search warrant?

9  **Q.**  Yes.  Uh-huh.

10  **A.**  I know that early that morning we arrived at his

11  residence.  And whenever we went to make entry into his front

12  screened-in porch, his female pit bull that he had was --

13          **THE COURT:**  I'm sorry?

14          **THE WITNESS:**  I'm sorry, Your Honor.  Can you hear me?

15          **THE COURT:**  I can, yeah, but you're kind of mumbling

16  there.  Speak up a little clearer, please.

17          **THE WITNESS:**  Yes, sir, Your Honor.

18  **A.**  On that morning whenever we made contact at the

19  residence, Mr. Bryant had a screened-in front porch to the

20  residence, and we had a female pit bull that came at us in an

21  aggressive manner.  And then after we determined that the pit

22  bull was going to run off from us, we made entry into the

23  residence and made contact with a female subject named Sabrina

24  Johnson and also Mr. Bryant and three juveniles, which we found

25  to be his children.

1  **BY MS. NORDSTROM:**

2  **Q.**   Uh-huh.

3          **THE COURT:**   Found to be what?

4          **THE WITNESS:**   His children.

5  **BY MS. NORDSTROM:**

6  **Q.**   All right.  You -- how many were in your party that

7  arrived?

8  **A.**   Can I review my case?

9  **Q.**   Uh-huh.  Yes.

10  **A.**   There was myself, Sergeant Lonnie McClinton, Cordell

11  Daniels, and Lieutenant Nakia Hunt with the juvenile and gangs

12  division, and also Kenneth Allen, who I believe at the time was

13  in the juvenile division as well.

14  **Q.**   Were y'all in plain clothes?

15  **A.**   I mean, I don't remember exactly what I was wearing that

16  day.

17  **Q.**   Uh-huh.  I mean, do you have regular police outfits, or

18  was this just plain clothes?

19  **A.**   I know I probably -- I wasn't wearing a Class A uniform.

20  I know that.  I don't remember exactly what I was wearing that

21  day.  But anytime that we conduct search warrants, we would

22  make sure that we had police on our tactical vests, you know,

23  in bold print.  I guess that's common practice for conducting a

24  search warrant, try to show as much police on us as possible.

25  **Q.**   Okay.  And who had the battering ram?

1   **A.**    That would -- I would assume Cordell Daniels.

2   **Q.**    Okay.  How many times did it take y'all to break his door

3   in?

4   **A.**    I don't remember.

5   **Q.**    Okay.  If I said three, would that sound about right?

6   **A.**    I don't remember.

7   **Q.**    Was part of this door glass?

8   **A.**    I -- I don't remember if his door was glass.

9   **Q.**    You don't remember the door shattering and injuring his

10  girlfriend?

11        **THE COURT:**  Ms. Nordstrom, I haven't heard any

12  testimony that they used a battering ram.

13  **BY MS. NORDSTROM:**

14   **Q.**    Did you use -- I'm sorry.  Did you use a battering ram?

15   **A.**    I didn't, but I would assume Investigator --

16        **THE COURT:**  I don't want to hear what people assume.

17  You know what you saw or what you heard.  Did you or -- did you

18  see or not see somebody use a battering ram?

19        **THE WITNESS:**  I know that we did use a battering ram.

20  **BY MS. NORDSTROM:**

21   **Q.**    You did use a battering ram?

22   **A.**    Yes, ma'am.

23   **Q.**    Okay.  Did you break in the door?

24   **A.**    Yes, ma'am.

25   **Q.**    Okay.  Do you remember glass shattering?

1   **A.**    I don't remember if glass shattered or not.

2   **Q.**    Okay.  Is that not in your report where it talks about

3   there was a cut on his girlfriend's leg as a result?

4   **A.**    I do remember that Ms. Johnson advised us she had

5   sustained an injury during the entry into the house.  And we

6   called after for the ambulance service, and they checked her

7   out and deemed that there wasn't any medical emergency, and

8   they wrapped her foot up.

9   **Q.**    All right.  And was that injury caused by the door being

10  broken in?

11  **A.**    I'm not sure.

12  **Q.**    Uh-huh.  Did you have your guns drawn?

13  **A.**    I -- I would feel like we did.

14  **Q.**    Okay.  And did you -- did you announce at any time before

15  busting in the door?

16  **A.**    Yes, ma'am.

17  **Q.**    You did?

18  **A.**    As soon as we made contact with that door, we would be

19  yelling police.

20  **Q.**    Uh-huh.  Okay.  And what do you -- what are you saying

21  when you open the door?

22  **A.**    Police, search warrant.

23  **Q.**    Okay.

24  **A.**    Police, search warrant.

25  **Q.**    You're not saying get the F down?

1   **A**.    I wouldn't be saying get the F down.  I'm not sure.  I

2   don't remember anybody else saying it.  But I know that I

3   always say police, search warrant.

4   **Q**.    Uh-huh.  Okay.

5           **THE COURT**:  Ms. Nordstrom, I want to clarify

6   something.

7           Officer West, I heard -- I thought I heard you say

8   there was a female on the front porch.  Was that a -- was that

9   a pit bull you're talking about, or is that a person?

10          **THE WITNESS**:  On the front porch, there was a female

11  pit bull.

12          **THE COURT**:  A female pit bull?

13          **THE WITNESS**:  Canine.

14          **THE COURT**:  But not a person?

15          **THE WITNESS**:  Inside of the residence was his

16  girlfriend, Ms. Sabrina Johnson.

17          **THE COURT**:  So -- okay.  But the female, the

18  girlfriend, was not on the front porch?

19          **THE WITNESS**:  No.  No, sir.

20          **THE COURT**:  No person on the front porch?

21          **THE WITNESS**:  No, sir.

22          **THE COURT**:  Okay.  Thank you.  I just wanted to -- I

23  wasn't sure about that, Ms. Nordstrom, so I understand it now.

24  **BY MS. NORDSTROM**:

25  **Q**.    Okay.  And, at that point, what happens once you've made

1  entry?

2  **A.**  With, like, our common practice with search warrants?

3  **Q.**  Let's talk about what do you remember about Mr. Bryant

4  and when you made entry.

5  **A.**  That we made contact with Ms. Sabrina, Mr. Bryant, and

6  the children, and we detained Mr. Bryant and his girlfriend.

7  We didn't detain the juveniles.

8  **Q.**  Okay.  All right.  And then you proceeded to question

9  Mr. Bryant and take him into custody; is that right?

10  **A.**  I don't know if we questioned him on the scene.

11  **Q.**  Okay.  I'll let you read what you found in the house.  I

12  know we've already talked about it, but just --

13  **A.**  Is there an inventory sheet at the end of my report?

14  It's not on here.

15  **Q.**  It is.  I mean, I don't have the inventory sheet with the

16  exhibits, but if you look at paragraph three of the second page

17  of your case report from June 17th, it will tell you.

18  **A.**  Yes, ma'am.  But in my Report of Investigation on the

19  last -- there was an additional page on my Report of

20  Investigation with the items that we located.  It was just a

21  list of the items.

22  **Q.**  Is it a document that looks like this?

23  **A.**  No, ma'am.  But that is an inventory sheet from the

24  search warrant.

25  **Q.**  Okay.

1   **A**.    But on my Report of Investigation, there was -- on the
2   last page, there was a list of items that we got out of the
3   residence.

4            **THE COURT:**  All right.  It seems that the witness has
5   an inventory list but counsel does not.

6            **MS. NORDSTROM:**  He says that there is one that exists,
7   and I'm trying to find it.

8            **THE COURT:**  He has a copy.

9            **MS. NORDSTROM:**  He has a copy of it?  May I approach,
10  Your Honor?

11           **THE COURT:**  All right.

12           **MS. NORDSTROM:**  This was in your --

13           **THE COURT:**  He had one already.

14           **MS. NORDSTROM:**  Not from what I handed -- this was not
15  attached to what I handed him.

16           **THE COURT:**  Okay.

17           **MS. NORDSTROM:**  I don't remember seeing this, but --
18  **BY MS. NORDSTROM:**

19  **Q**.    Does that look like it?

20  **A**.    Yes.

21  **Q**.    All right.  Can you tell the Court what was found in
22  Mr. Bryant's house?

23  **A**.    Three black -- excuse me.  Three black plastic containers
24  with THC labels and marijuana plant logo containing marijuana
25  residue; one gray and black .380-caliber Hi-Point firearm; one

1  green and white Remington .380 round box containing eight

2  unspent rounds; one silver Bob Marley weed crusher; and one

3  glass pipe.

4  **Q.**  Okay.  All right.  Anything regarding cocaine?

5  **A.**  No, ma'am.

6  **Q.**  Okay.  Anything showing a selling/distributing of

7  firearms other than one firearm?

8  **A.**  Can you repeat the question?

9  **Q.**  Anything indicating that Mr. Bryant is in the business of

10 trafficking firearms, which is what your confidential informant

11 told you?

12 **A.**  You're saying with the items that we found in the house?

13 **Q.**  When you searched his home, is there anything to

14 indicate --

15 **A.**  No, ma'am.

16 **Q.**  Okay.  So you would agree with me your confidential

17 informant is not always right?

18 **A.**  I wouldn't think that he's always right.

19 **Q.**  Okay.  All right.  So let's talk about the things that

20 you did not tell Judge Prewitt in your application.  You did

21 not tell him what Mr. Bryant's criminal history is, right?

22 **A.**  I don't -- not from my memory.

23 **Q.**  Okay.  You did not tell Judge Prewitt when the last time

24 this confidential informant saw guns in Mr. Prewitt -- Bryant's

25 house, right?

1  **A**.    Not from my memory.

2  **Q**.    Okay.  You did not tell Judge Prewitt that the sale of

3  marijuana involved less than a gram of marijuana?

4  **A**.    I don't remember mine and Judge Prewitt's conversation.

5  **Q**.    Okay.  Would you not agree with me that those are

6  reasonable objective facts that the judge would have liked to

7  have had to determine whether to just do a garden variety

8  search warrant or a no-knock?

9  **A**.    I would agree those are things that could have been said.

10  I don't know if they were said or not.

11  **Q**.    Okay.  But they're definitely not in your application,

12  right, because you've reviewed it?

13  **A**.    Right.  They're not in my application.

14          **MS. NORDSTROM:**  Court's indulgence, Your Honor.

15          **THE COURT:**  All right.

16      (CONFERRING OFF THE RECORD.)

17          **MS. NORDSTROM:**  Your Honor, I tender the witness.

18          **THE COURT:**  All right.

19          **THE WITNESS:**  Do you want these documents back?

20          **MS. NORDSTROM:**  I'll just get these documents back

21  from you.  I would like to make this June 17th, 2019, Exhibit 4

22  for the defense.

23          **THE COURT:**  What is it?

24          **MS. NORDSTROM:**  D-4.  It's the June 17th, 2019,

25  report.

1      **THE COURT:**  Is that the list of the inventory?

2      **MS. NORDSTROM:**  It is not.  It's his report.  But I

3  don't have a copy of this.  We can make it --

4      **MR. MIMS:**  You should have it somewhere in your file

5  and just couldn't find it, but you can certainly have that one.

6      **MS. NORDSTROM:**  Okay.  Do you want to put that as part

7  of that D-4?

8      **MR. MIMS:**  Whatever you want to do.

9      **MS. NORDSTROM:**  Okay.  We can make this also a part of

10  that D-4 if everybody is okay with it.

11      (EXHIBIT NO. D-4 ADMITTED INTO EVIDENCE.)

12      **THE COURT:**  All right, Mr. Mims.

13      **MR. MIMS:**  Thank you, Your Honor.

14                    **CROSS-EXAMINATION**

15  **BY MR. MIMS:**

16  **Q.**  Sergeant West, I don't want to go back through all the

17  details.  I think you've testified to most of what happened,

18  but let me just ask you a few things I want to make sure of.

19      Just to be clear, you had a confidential informant that

20  gave you information that you -- that Antoine Bryant sold guns

21  and drugs out of his house; is that right?

22  **A.**  Yes, sir.

23  **Q.**  Was this a confidential informant that you had used

24  before?

25  **A.**  Yes, sir.

1   **Q.**   Okay.  And had you used this confidential informant many

2   times before?

3   **A.**   Yes, sir.

4   **Q.**   Okay.  Had you found this informant to be reliable in the

5   past?

6   **A.**   Yes, sir.

7   **Q.**   Okay.  Based upon that, you presented a search warrant to

8   Judge Prewitt -- you presented an affidavit to Judge Prewitt

9   for a search warrant; is that correct?

10   **A.**   Yes, sir.

11   **Q.**   All right.  Now, let me ask you about your history with

12   Judge Prewitt.  I just want to make sure we're clear -- I'm

13   clear on a couple of things.

14        Has he ever -- first of all, in regards to search warrant

15   applications, has he ever before rejected one of your search

16   warrant applications?

17   **A.**   Yes, sir.

18   **Q.**   Okay.  Has he ever rejected any other applications you

19   have presented him, like arrest warrants or so forth?

20   **A.**   Yes, sir.  He has rejected affidavits in the past.

21   **Q.**   Okay.  When you executed the search warrant, I understand

22   that you didn't actually find any marijuana in the house, just

23   residue inside some -- three little bottles, right?

24   **A.**   Yes, sir.

25   **Q.**   And did not find -- the only gun you found in the house

1 was the -- was it a .380-caliber?

2 **A.** It was a .380-caliber.

3 **Q.** Where was that located?

4 **A.** In the couch in the living room.

5 **Q.** And was that gun loaded?

6 **A.** Yes, sir.

7 **Q.** Tell me, how was it loaded?

8 **A.** With a round in the chamber of the gun.

9 **Q.** Okay. Did the gun have a magazine?

10 **A.** No, sir.

11 **Q.** Okay. Were there additional .380-caliber rounds in a box

12 close by?

13 **A.** Yes, sir.

14 **Q.** Okay. In your experience as a law enforcement officer,

15 can you estimate how many times you've executed search warrants

16 similar to this?

17 **A.** I couldn't even give an estimation.

18 **Q.** Is it something unusual, or is it something you would do

19 frequently?

20 **A.** It's something we would do very frequently.

21 **Q.** Okay. How long have you been in the criminal -- I'm

22 sorry. How long were you in the special operations division?

23 **A.** From August of 2019 to, I believe, last September or

24 October. It was late last year whenever I left.

25 **Q.** Okay. Special operations focuses on drug crimes,

1    correct?

2    **A.**    Yes, sir.

3    **Q.**    All right.  In your time in the special operations

4    division, did you execute a lot of search warrants?

5    **A.**    We did.

6    **Q.**    All right.  Do you always find stores of drugs in drug

7    dealers' homes?

8    **A.**    No, sir.

9    **Q.**    Okay.  Why is that?

10    **A.**    Just the luck of the draw sometimes.  I mean, people sell

11    out.  You know, they're waiting to get their product in.

12    It's -- it's -- sometimes it's, like, a hit or miss.

13    **Q.**    What about guns?  Would you say the same thing for guns

14    if someone is a gun dealer?

15    **A.**    Yes, sir.

16    **Q.**    This isn't like going to Hunters' Hollow.  When I go to

17    Hunters' Hollow -- you're not from Oxford.  You may not be

18    familiar with it, but Hunters' Hollow is a sporting goods

19    store.  If I go in there, they've got walls of shotguns and

20    rifles and a long display case as long as this room or longer

21    with pistols.  Is that what a gun dealer on the street does?

22    Do they have big display cases and hundreds of shotguns and

23    rifles?

24    **A.**    No, sir.

25    **Q.**    So would it be unusual for a gun dealer -- to execute a

1 search warrant and there not be guns for sale in a house?

2 **A.** No, sir.

3 **Q.** All right. Let's go back to getting the search warrant.

4 You had your CI give you information that Mr. Bryant sold drugs

5 and guns. You followed up and did what you called a buy

6 walk -- I call it a controlled buy -- with your CI and

7 Mr. Bryant, correct?

8 **A.** Yes, sir.

9 **Q.** Did he, in fact, buy illegal drugs from Mr. Bryant?

10 **A.** He did.

11 **Q.** Okay. When you do the controlled buy, do you search your

12 CI before he goes in and buys drugs from Mr. Bryant?

13 **A.** Yes, sir.

14 **Q.** What's the purpose of searching your CI?

15 **A.** To make sure that whenever that CI comes to us he doesn't

16 already have any drugs on him or weapons or any kind of

17 contraband.

18 **Q.** And then you search him when he comes back, correct?

19 **A.** Yes, sir.

20 **Q.** Do you also wire him up with audio/video surveillance

21 equipment?

22 **A.** Yes, sir.

23 **Q.** Okay. What's the purpose of that?

24 **A.** For documentation.

25 **Q.** Okay. Did you wire your CI up in this case?

1  **A.**   Yes, sir.

2  **Q.**   Have you reviewed that audio/video afterwards?

3  **A.**   Yes, sir.

4  **Q.**   Can you see on the audio and video that he, in fact,

5  bought illegal drugs from Mr. Bryant?

6  **A.**   Yes, sir.

7  **Q.**   Do you conduct surveillance while your CI is doing this?

8  **A.**   Yes, sir.

9  **Q.**   What's the purpose of that?

10  **A.**   Just extra -- making sure that the CI, whenever he or she

11  leaves from the pre-buy location, drives directly to the buy

12  location, and then after that buy is made, he or she drives

13  directly back to us.

14  **Q.**   Okay.  So when opposing counsel says -- made the comment

15  that 90 percent of your affidavit -- the information in your

16  affidavit came from the CI, in fact, besides what your CI told

17  you, you had a controlled buy where you conduct surveillance

18  and you have audio/video backing up the controlled buy; is that

19  correct?

20  **A.**   That's correct.

21        **THE COURT:**   Now, were you talking about this time

22  or --

23        **MR. MIMS:**  Yes, sir.

24        **THE COURT:**   -- usual time?

25  **BY MR. MIMS:**

1   **Q.**   Just to be clear, Sergeant West, I'm talking about this
2   particular time.

3   **A.**   Yes, sir.

4   **Q.**   Okay.  That's also your standard procedure every time,
5   isn't it?

6   **A.**   Yes, sir.

7   **Q.**   Now, opposing counsel kept using the term *misdemeanor*
8   *amount of marijuana*.  I understand if you find somebody on the
9   street and you find some marijuana on them that it has to be a
10  certain level to be felony possession of marijuana, correct?

11  **A.**   That's correct.

12  **Q.**   Okay.  And whatever this was, less than a gram, if it's
13  just in your possession, that would be a misdemeanor charge,
14  right?

15  **A.**   That would be a misdemeanor charge.

16  **Q.**   Is it a felony, though, to sell marijuana in any amount?

17  **A.**   Yes, sir.

18  **Q.**   So it doesn't matter if you only have a gram of
19  marijuana.  However much that would be, that's still a felony
20  to sell marijuana, isn't it?

21  **A.**   Yes, sir.

22          **MR. MIMS:**  Your Honor, if I may have just one minute,
23  I think I can eliminate most of the rest of this.

24  **BY MR. MIMS:**

25  **Q.**   Oh.  Your affidavit that you presented to Judge

1　Prewitt -- I believe it's marked as Exhibit D-2 -- it's got

2　your affidavit and underlying facts and circumstances.  Is

3　everything you put in that affidavit true to your knowledge?

4　**A.**　Yes, sir.

5　**Q.**　Okay.  And does the presence of firearms present a threat

6　to law enforcement?

7　**A.**　Yes, sir.

8　**Q.**　One last thing.  After you executed the search warrant,

9　did you take any statements from Mr. Bryant?

10　**A.**　We did.

11　**Q.**　What did Mr. Bryant tell you?

12　**A.**　Is this in reference to the firearm?

13　**Q.**　Yes.

14　**A.**　That he had lived in that residence for approximately two

15　years, and he said that whenever he moved into the residence,

16　that firearm was already there, and he decided to keep the

17　firearm for protection.

18　**Q.**　Okay.

19　　　　**MR. MIMS:**  Thank you, Your Honor.  I have no further

20　questions.

21　　　　**THE COURT:**  All right.  Anything further,

22　Ms. Nordstrom?

23　　　　**MS. NORDSTROM:**  A few follow-up questions.

24　　　　**THE COURT:**  Okay.  In line with cross-examination?

25　　　　**MS. NORDSTROM:**  Yes, sir.

1    **THE COURT:** You may proceed.

2    **MS. NORDSTROM:** Thank you.

3    **REDIRECT EXAMINATION**

4    BY MS. NORDSTROM:

5    **Q.** Sergeant West, you just testified that everything -- all

6    the details that are presented in your affidavit and underlying

7    facts and circumstances are correct; is that right?

8    **A.** Yes, ma'am.

9    **Q.** Okay. And yet you put in your affidavit that, on an

10   earlier date, he, being the CI, advised that he/she could

11   purchase illegal drugs and guns from him. Is that what you

12   wrote?

13   **A.** I mean, I believe you that that's what I wrote.

14   **Q.** But that's not true; is that right?

15   **A.** I would think it's true.

16   **Q.** Okay. Didn't you testify earlier that Mr. -- the

17   confidential informant did not say that he could purchase guns?

18   He just knew that Mr. Bryant had guns; is that right?

19   **A.** I -- I believe that I said that.

20   **Q.** Okay. Because I believe what -- I asked you the question

21   why didn't you have him buy a gun. Remember that question?

22   **A.** I don't remember exactly the question, but I remember you

23   asked me something like that.

24   **Q.** Okay. And you said, "Well, he didn't think he could buy

25   one from Mr. Bryant." Is that right?

1   **A.**   I believe you that that must have been what I said.

2   **Q.**   Okay.  So the information that you provided to Judge

3   Prewitt is not completely accurate, correct?

4   **A.**   I mean, I wouldn't have lied on the affidavit.  Maybe

5   I -- I mean, I -- maybe from my memory -- maybe my memory from

6   that day isn't correct.  Maybe -- well, what am I trying to

7   say?  I apologize for getting tongue-twisted here.

8   **Q.**   That's okay.

9   **A.**   I'm not trying to have not corroborating statements.

10  **Q.**   Okay.

11  **A.**   I don't remember.  I don't remember.

12  **Q.**   Okay.  You don't remember if you put that in the

13  affidavit or you don't remember that it's not true?  What do

14  you --

15  **A.**   I mean, I wouldn't have lied.  I know that.

16  **Q.**   Uh-huh.

17  **A.**   Maybe from my memory sitting up here, I might have been

18  mistaken with my testimony.

19  **Q.**   Uh-huh.  Okay.  Because if you're going to send somebody

20  in to buy some marijuana, less than a gram of marijuana, and he

21  tells you that he can buy guns too, wouldn't you ask him to,

22  "Hey, let's just go get a gun too"?  Wouldn't you as an

23  investigator?

24  **A.**   I don't remember the decision we made, but I know that --

25  I know the reason why we bought $10 worth of marijuana was

1  because we were just trying to get a search warrant for the
2  residence.
3  **Q**.    Uh-huh.
4  **A**.    We weren't going to prosecute the buy from that day.  I
5  know that that is why we only spent $10.
6  **Q**.    Uh-huh.  Okay.
7           **MS. NORDSTROM**:  Nothing further.
8           **THE COURT**:  All right.  You may step down.
9           **MR. MIMS**:  Your Honor, now that this witness has
10  testified, may he remain in the courtroom?
11          **THE COURT**:  Yes.
12          **MR. MIMS**:  Thank you.
13          **THE COURT**:  All right.  Any other witnesses?
14          **MS. NORDSTROM**:  Yes, Your Honor.  I call Judge
15  Prewitt, William (sic) Prewitt.
16          **THE COURT**:  Okay.
17     (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)
18          **COURTROOM DEPUTY**:  Please take a seat.  And, if you
19  would, state and spell your first and last name for the record.
20          **THE WITNESS**:  It's Michael, M-i-c-h-a-e-l, Prewitt,
21  P-r-e-w-i-t-t.
22    **MICHAEL PREWITT, DEFENDANT'S WITNESS, AFTER BEING DULY SWORN,**
23              **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**
24                   **DIRECT EXAMINATION**
25  **BY MS. NORDSTROM:**

1   **Q.**   Good afternoon, Mr. Prewitt.  Good to see you.

2   **A.**   Good evening.

3   **Q.**   I believe the judge is fine with you removing your mask

4   if you're comfortable with that.

5   **A.**   Thank you.  If it's -- if --

6   **Q.**   Mr. Prewitt, could you give us your occupation?

7   **A.**   I'm an attorney in Greenville.

8   **Q.**   Okay.

9   **A.**   And also part-time judge.

10  **Q.**   Part-time judge.  Okay.  For the Greenville Municipal

11  Court; is that right?

12  **A.**   That's correct.  And also Hollandale.

13  **Q.**   Okay.  And how long have you been a Greenville municipal

14  judge?

15  **A.**   About 22 years.

16  **Q.**   Okay.  And, you know, I won't go into -- it's been a long

17  day.  Judge has been on the bench all day, so let's speed this

18  stuff up.  Tell me about, in your training as municipal court

19  judge and your experience, what is required for issuing a

20  no-knock search warrant.

21  **A.**   Well, I mean, I think most search warrants, you know,

22  relating to residences and that sort of thing probably are

23  no-knock.  But, you know, the threat of injury to officers or

24  occupants of a property, destruction of evidence, you know.

25  **Q.**   Okay.  All right.  So what would you say statistically in

1  your issuance or granting of search warrants are no-knock

2  search warrants of residences?

3  **A.**   What's the first part of your question?

4  **Q.**   Yeah.  That was --

5  **A.**   I'm sorry.

6  **Q.**   Okay.  So, in your practice as judge, you grant

7  periodically search warrants of residences?

8  **A.**   Correct.

9  **Q.**   Okay.  What's the percentage of those search warrants of

10  residences that are no-knocks?

11  **A.**   I certainly couldn't give you an accurate, you know,

12  statistical amount, but I would say, more often than not, they

13  are.

14  **Q.**   Okay.

15  **A.**   I mean, searching a residence, unless -- I mean, granted,

16  it took me a while to get police officers to understand that

17  there's not a murder exception to a search warrant just because

18  a murder had occurred on the property.  You know, that -- you

19  wouldn't -- you wouldn't need a no-knock search warrant to go

20  in and try to find information about that crime that may have

21  been committed in a residence, but those types of search

22  warrants are the exception.  More often, they are related to

23  narcotics or gun or drug trafficking.

24  **Q.**   All right.  Now, you periodically grant search warrants

25  for homes involving narcotics; is that correct?

1   **A.**    That's correct.

2   **Q.**    What would you say percentage-wise of your homes for

3   narcotics that you grant a no-knock search warrant?

4   **A.**    Again, you know, I don't want to pin myself into a corner

5   on a percentage, but I would think that there's a greater

6   number of no-knock search warrants that are issued than those

7   that are not.

8   **Q.**    Okay.

9   **A.**    And let me add, I can't sit here today and tell you how

10   many search warrants I signed in 2021, how many I've signed

11   this year, in 2019 when this event occurred.  I remember the

12   last one I denied, but, you know, it was --

13   **Q.**    Have you ever denied a no-knock search warrant?

14   **A.**    I can't answer that question.  I honestly don't know.  I

15   have denied search warrants.  I've denied arrest warrants.  You

16   know, I've ordered people arrested only to turn around and

17   release them three days later.  It just depends on the

18   circumstance.

19   **Q.**    Have you reviewed anything here today for your testimony?

20   **A.**    I reviewed your pleadings and that of the U.S. Attorney.

21   **Q.**    You -- so you got on -- I'm assuming you got on ECF --

22   **A.**    Yeah.

23   **Q.**    -- and looked it up?

24   **A.**    Yeah.  Your investigator, who I spent about an hour with,

25   he wasn't very forthcoming on what your case was about, and I

1 certainly didn't remember the defendant, so I just pulled it

2 up.

3 **Q.** So you've looked at the pleadings. So you've looked at

4 the application for the search warrant and the search warrant

5 itself?

6 **A.** Yes.

7 **MS. NORDSTROM:** Okay. May I approach the witness,

8 Your Honor?

9 **THE COURT:** Very well.

10 **A.** Well, let me say I've looked at them if they're on the

11 CM/ECF or the electronic court file.

12 **BY MS. NORDSTROM:**

13 **Q.** I understand.

14 **A.** I just want to add that.

15 **Q.** It's there. Okay. I'm going to hand to you a document

16 entitled "Affidavit For a No-Knock Search Warrant," if you want

17 to look at that.

18 **A.** Okay.

19 **Q.** You say that you've reviewed this?

20 **A.** I have scanned over it, yes.

21 **Q.** Okay. What of that affidavit would you say arises to the

22 threshold of requiring a no-knock search warrant?

23 **A.** Well, obviously, there's a difference of opinion about

24 whether or not it does, I mean, based on your pleadings and

25 those of the U.S. Attorney. The fact that there's a threat or

1 references to the sale of firearms from the residence and the

2 drug trafficking, it's -- or drug sales.

3 **Q.** Do you have any independent recollection of your

4 conversation with Investigator West regarding this particular

5 search warrant?

6 **A.** Not at all.

7 **Q.** Okay. And would you agree with me that the allegations

8 of sale of firearms was all from a confidential informant?

9 **A.** It appears to be so based on this document, yes. As I

10 said, I don't have any specific recollection about that

11 information.

12 **Q.** Okay. And so there's nothing in the affidavit that -- or

13 the underlying facts and circumstances that indicates that

14 Investigator West or anybody else with Greenville Police

15 Department did any type of independent investigation to

16 corroborate the allegation of firearms?

17 **A.** I don't mean to argue with you about it, but, I mean, the

18 affidavit speaks for itself. I mean, it's -- you know.

19 **Q.** Okay. All right.

20 **A.** I didn't -- I didn't go out and do some, you know, fact

21 check of what a CI would have told him.

22 **Q.** Uh-huh.

23 **A.** Can I have a Kleenex? Getting old is rough. I

24 apologize.

25 **Q.** It's okay. So was there anything in this affidavit

1   regarding Mr. Bryant's -- anything of violent criminal history?

2   **A.**    In reviewing the affidavit today, I did not see, as you

3   pointed out in your pleadings, a reference to a violent past or

4   background.

5   **Q.**    Okay.  All right.  And is there any -- would that have

6   been something that would be relevant in you determining

7   whether or not to issue a no-knock search warrant?

8   **A.**    I think it's relevant, certainly.

9   **Q.**    Okay.  Is there anything in that affidavit about the

10  quantity of marijuana that was sold that they allege?

11  **A.**    I don't know.  Tell me.  I don't recall.  I don't

12  remember the specific amount.

13  **Q.**    Okay.

14  **A.**    I remember there being a prior sale.  Confidential

15  informant had indicated that there was a prior sale of

16  marijuana from the residence.

17  **Q.**    Okay.  If there was -- if you found out that it was

18  0.87 grams of marijuana that was sold for $10, would that be

19  something you would want to know before issuing a no-knock

20  search warrant?

21  **A.**    I want to know as many facts as I can.  I mean, I've

22  dismissed cases with trunk loads of marijuana and 200 weapons

23  in the trunk, you know.  I mean, it just depends on what it is.

24  It's not -- you know, the -- there's not always a specific easy

25  connect-up in why things occur or what may occur.  You're kind

1  of asking me to -- well, to theorize about what I might do.

2  I can tell you what I did do.  You know, I mean, it's --
3  granted, my independent recollection of this is -- you know, I
4  recognize the name.  You know, when you've been a municipal
5  judge for 22 years, I'm probably as old as this guy.  I've been
6  a judge probably as long as this guy is old.  You know, you
7  hear names.  You hear, you know, repeat circumstances.

8  And I'm more likely to ask you -- I had a lawyer ask me
9  one time about a particular defendant in a murder case.  And I
10  said, "I don't remember a name.  Tell me what he did," you
11  know, because I don't try to make decisions on who somebody is.
12  I'm trying to make a decision based on what somebody has done.
13  **Q**.   Uh-huh.  All right.  So, again, back to my question, the
14  fact that this involved a sale of 0.87 grams of marijuana for
15  $10, is that not relevant?

16  **A**.   Granted, that's not a lot of marijuana.  That's not a lot
17  of marijuana.  I mean, if they were sleeping on a mattress made
18  out of marijuana, granted, that would be a lot of marijuana,
19  but the real question is going to be one of, I think, safety
20  for everyone involved.

21  One of the things I typically always ask officers to do
22  when they're serving a search warrant, unless it's on a cell
23  phone or some parked vehicle, is to call me and tell me that
24  everybody got out.  That's really all I want to know.  I like
25  knowing that the information that I received was accurate or

1  valid.

2  I mean, I can tell you that it burns me when some

3  detective comes to me -- and this happened years ago. You

4  know, they had six dry holes, if you will, in a row. It

5  certainly makes you question, you know, am I asking the right

6  things? Are they giving me the right information, or have I

7  been getting the runaround? So I want to know, you know, was

8  there something to this? Did you find what you told me you

9  were going to find when you went in?

10  **Q.** Uh-huh.

11  **A.** And I also want to make sure that an officer is safe and

12  the people in the property are safe.

13  **Q.** Right. And what is your understanding of what happens in

14  a no-knock search warrant?

15  **A.** Well, I really think the Supreme Court in practical

16  effects has done away with the no-knock. I mean, if you -- I

17  think there's a case one of y'all cited, I believe, where there

18  was, like, a 20-second wait at the door before going in. Am I

19  remembering that correctly?

20  **Q.** I don't know.

21  **A.** You know, that's enough time for me to pull a police

22  issued .40-caliber off of my nightstand and my German shepherd

23  to greet you at the door. I mean, you know, that is, in

24  essence, a no-knock. If you're going to give me 20 seconds to

25  greet you at the front door -- I can't quote the case, but, you

1   know, if that's what you're going to give me, that basically is
2   a no-knock.

3         But what I think occurs is that the police locate the
4   residence.  They set up on the scene.  They have a perimeter,
5   you know, that they're watching to make sure somebody new
6   doesn't come into the property or into the scenario, the mix, I
7   guess; that they have enough officers there; that they are at
8   the right place, you know; and then they enter the property, I
9   would assume.

10        I've never been on one, of course, but I assume that
11  they're screaming at the top of their lungs, you know, "Police,
12  police, police, and search warrant."  You know, you'd want to
13  alert somebody in there about who it is that's coming through
14  the front door.

15  **Q.**   And is it your understanding that they break into the
16  door?

17  **A.**   Yeah.

18  **Q.**   Okay.

19  **A.**   Yes.  I mean, maybe not always.  I don't know that it's
20  always locked, but, you know, I'm giving them the permission to
21  do so, let me put it that way.

22  **Q.**   Uh-huh.  Okay.  And so -- now, again, tell me, when
23  there's narcotics alleged, you said more often than not you
24  issue a no-knock; is that right?

25  **A.**   I would think that that would be an accurate statement.

 1   **Q.**   Okay. All right.

 2   **A.**   I mean --

 3   **Q.**   When you're saying more likely than not, are you talking

 4   90 percent of the time? 95?

 5   **A.**   I couldn't give you that answer.

 6   **Q.**   Okay. Well, we've pulled since 2019 every case involving

 7   Greenville Police Department --

 8   **A.**   All right.

 9   **Q.**   -- involving a search warrant for narcotics when you

10   signed it, and we came up with ten. That's just from 2019. Do

11   you know how many are no-knocks?

12   **A.**   I'm pretty sure you're going to tell me ten.

13   **Q.**   Yes.

14   **A.**   Okay.

15   **Q.**   Does that sound unreasonable?

16   **A.**   No.

17   **Q.**   Okay.

18   **A.**   I don't even know what would make it unreasonable.

19   **Q.**   Give me a -- so it's just the mere presence of drugs that

20   it calls for a no-knock?

21   **A.**   No.

22   **Q.**   Okay.

23   **A.**   I mean, you know, there are, obviously, other factors. I

24   mean, you know, the risk of injury to -- you know, to officers

25   or civilians, even the defendant -- the potential defendant.

1   **Q.**   Uh-huh.  So if I told -- if you were told that something

2   in the affidavit that was provided to you on this occasion was

3   not truthful, what would that indicate to you?

4   **A.**   Beyond that something wasn't truthful?

5   **Q.**   Uh-huh.

6   **A.**   I'm not sure I --

7          **MR. MIMS**:  Your Honor, I'm going to object to the

8   question on the grounds that counsel is implying there's

9   something untruthful in there, and I don't believe there is.  I

10  think there's one word that counsel is nitpicking about that

11  does not affect the truthfulness of this affidavit.  I object

12  to the question.

13         **THE COURT**:  It's a hypothetical.  I don't believe it's

14  necessary to go into it one way or the other.  The objection is

15  sustained.

16  **BY MS. NORDSTROM:**

17  **Q.**   Okay.  Do you have a copy of the affidavit?

18  **A.**   I have this document.

19  **Q.**   Okay.  And could you read to the Court what it says about

20  anything regarding guns?

21  **A.**   (Reviews document.)

22         **THE COURT**:  All right.  Ms. Nordstrom, you have that.

23  You know where it is.  Just read it and just ask him if that's

24  accurate or not.

25  **BY MS. NORDSTROM:**

1  **Q.**    It's under the underlying facts and circumstances on the

2  Details --

3  **A.**    Okay.

4  **Q.**    -- about the second line.  It says, "On an earlier date,

5  he advised he/she could purchase illegal drugs and guns from

6  him."  Do you see that?

7  **A.**    Show me what page.

8  **Q.**    Okay.  So you've got your affidavit for the search

9  warrant --

10  **A.**    Okay.  All right.

11  **Q.**    -- Details.  "On an earlier date," okay?

12  **A.**    Oh, okay.  "On an earlier date, he/she -- he advised

13  he/she could purchase illegal drugs and guns from him."

14  **Q.**    Okay.

15  **A.**    He's affiliated with another person.

16  **Q.**    Okay.  We can stop.  That's not about guns.  So that

17  would be one of the reasons that you issued the no-knock?

18  **A.**    Yes.  The first reference here to firearms, however, is

19  on page 1 of the affidavit for the no-knock search warrant

20  under Subsection 2, you know, when it says that the residence

21  described above is controlled by Antoine Bryant and unknown

22  persons.  "Those said things are particularly described, as

23  follows," meaning the items that may be in the residence, and

24  it does reference -- I saw it a moment ago -- firearms which

25  may be used to protect drugs, drug proceeds, drug trafficking

1  activities, including handguns, rifles, shotguns, and automatic
2  weapons, you know, et cetera.

3  **Q.**  And that's just something generic with what potentially
4  may occur with people who are in the business with drugs,
5  right?

6  **A.**  Yeah.  It may be generic, but, you know, I'm one of those
7  people that if it looks like a duck, it walks like a duck, it
8  quacks like a duck, it might be a duck.  You know, I've seen a
9  lot of duck activity in Greenville, Mississippi, in 22 years
10  involving guns and narcotics.  I mean, you know, it's a strange
11  place.  We had a nephew kill an uncle and an uncle kill a
12  nephew in the last 48 hours.

13  **Q.**  Right.

14  **A.**  You know, so, I mean, it's just -- there's not anything
15  that you can say generically about the fact that someone buys
16  or sells, you know, guns or narcotics or trafficking.  It's not
17  generic to your house, I would assume.  It's not generic to
18  mine.  It may be par for the course in other places within the
19  city.

20  **Q.**  Uh-huh.

21  **A.**  I mean, we literally have an open air drug market.

22  **Q.**  Uh-huh.  So you're claiming you issue no-knocks because
23  Greenville is inherently dangerous.  Is that what you're
24  saying?

25  **A.**  No.  I'm saying, you know, the drug business is

1  dangerous.

2  **Q.**   Okay.

3  **A.**   Would you agree with me there?

4  **Q.**   Well, I'm not on the stand.

5  **A.**   I agree.   Okay.   I think the drug dealers can be very

6  dangerous.

7  **Q.**   Okay.   You would agree with me that in this affidavit for

8  a search warrant, there's nothing in here specific about

9  Mr. Bryant being violent?   Would you agree with that statement?

10  **A.**   I don't recall seeing anything in the affidavit about

11  specific instances of violent conduct.

12  **Q.**   You would agree with me that anything in here about guns

13  or firearms being sold or possessed is all from a confidential

14  informant; is that right?

15  **A.**   I would agree that it appears to be from a confidential

16  informant.   That's correct.

17  **Q.**   Okay.   And you would agree with me that you never asked

18  Investigator West anything about this confidential informant,

19  how many sales he's done, how many times he's testified, how

20  truthful he is.   You just went on Investigator West's word; is

21  that right?

22  **A.**   I went on the representation that they had used the

23  confidential informant in the past, that he was a coded CI that

24  they had used in the past.   You know, I -- I don't get too deep

25  into who a confidential informant is and what they know.

1  **Q.**  Right.  Okay.  And is that because you trust Investigator

2  West?  Is that -- would that be a fair statement?

3  **A.**  I trust Investigator West.  But I think any officer in

4  Greenville that's presented me with a search warrant or an

5  arrest warrant would say "Don't take a bunch of garbage to

6  Prewitt because he's going to kick it out or try to."  I mean,

7  I don't sign everything that comes my way.

8  **Q.**  Uh-huh.  Uh-huh.

9  **A.**  That doesn't mean that I don't trust the officer when I

10  say I'm not going to sign something, however.

11  **Q.**  Okay.  But you didn't ask any questions about this

12  particular confidential informant, because you would agree with

13  me that this affidavit is about 90 percent this informant?

14  **A.**  I don't recall the conversation that I had with Johnathan

15  West is my earlier comment, but I would not have gone into a,

16  you know, deposition with him about who the CI was, et cetera.

17  **Q.**  Did you not -- you said you met with my investigator,

18  right?

19  **A.**  I did.

20  **Q.**  For about an hour?

21  **A.**  Seems like that.

22  **Q.**  Did you tell my investigator --

23  **A.**  He told me Greg Park was going to buy me the biggest

24  steak in Texas one day.

25  **Q.**  That what now?

1   **A.**    I'm just kidding. I'm sorry.

2   **Q.**    I think you're saying something about my boss.

3   **A.**    I know it's late.

4   **Q.**    Okay. Moving on. It's late in the day. Did you not

5   tell my investigator that all of your search warrants for homes

6   are no-knocks?

7   **A.**    I don't recall making that statement.

8   **Q.**    Okay. Did you --

9   **A.**    That all search warrants are no-knocks?

10   **Q.**    That all of your search warrants of homes are no-knocks.

11   **A.**    I don't recall making that statement. I think I did

12   state to him that I consider the Supreme Court has essentially

13   had abrogated the need for a knock warrant.

14   **Q.**    Uh-huh.

15   **A.**    I think the first question in any search warrant is, is

16   there probable cause to do a search, period.

17   **Q.**    Right.

18   **A.**    Yeah.

19   **Q.**    Absolutely.

20   **A.**    I think that there was in this case, you know.

21   **Q.**    Okay.

22   **A.**    The disagreement that there seems to exist is whether or

23   not -- is how they entered the premises, not whether or not

24   they had a right to.

25   **Q.**    Uh-huh. So, again, did you tell my investigator that all

1   of your home search warrants are no-knocks?

2   **A.**   I don't recall making that statement.

3   **Q.**   Okay.  Did you tell my investigator that you could issue

4   a no-knock search warrant for a sweater?

5   **A.**   I did say that.

6   **Q.**   Okay.  Have you ever heard of the word *rubber stamping*?

7   **A.**   Oh, yeah.  Yeah.

8   **Q.**   Are you rubber stamping no-knock search warrants in

9   Greenville, Mississippi?

10  **A.**   No, I'm certainly not.

11  **Q.**   You're not?  Okay.

12  **A.**   How many have I denied?  Have you looked at that?

13  **Q.**   For no-knock search warrants?

14  **A.**   No.  For search warrants.

15  **Q.**   Okay.

16  **A.**   I know, but I mean --

17  **Q.**   Municipal court has no -- it's not a court of record, so

18  I couldn't find it.

19  **A.**   Well, we apparently have enough records to go back

20  three years.  I'm not trying to argue with you, but my point is

21  that, you know, I'm not going to sign everything that comes in

22  front of me just because some police officer walks through the

23  door or is standing in my driveway at 3:00 in the morning, you

24  know, or whatever.

25  **Q.**   Right.

1    **A.**    I mean, I've spent hours with ATF on an arrest warrant on

2    the church burning in Greenville that made news when the Trump

3    campaign was going on, hours and hours going over everything,

4    and they had it nailed two hours before they quit talking.

5    **Q.**    You would agree with me in this affidavit for the search

6    warrant there's nothing in there that indicates when this

7    alleged CI saw guns in Mr. Bryant's home?

8    **A.**    Well, it seems like it references a couple of day period,

9    doesn't it?

10   **Q.**    That's for the sale of marijuana.  It doesn't say

11   anything about -- I mean, you can look, but --

12            **THE COURT:**  These documents speak for themselves.

13   Let's move on.

14            **MS. NORDSTROM:**  Yes, sir.

15   **BY MS. NORDSTROM:**

16   **Q.**    You will agree with me that there's no exigent

17   circumstances included in Investigator West's affidavit, would

18   you not?

19   **A.**    I understand that's the legal argument that fits the

20   definition.  I mean, I considered it sufficient for the

21   issuance of a no-knock search warrant.

22   **Q.**    Okay.  Would you not find that providing information

23   concerning Mr. Bryant's criminal convictions would be relevant

24   to the issuance of a no-knock?

25   **A.**    I think it would, yes.

1  **Q.** And you did not receive that, correct?

2  **A.** Not that I recall.

3  **Q.** And you never asked for it, did you?

4  **A.** Not that I recall.

5  **Q.** Okay. Would it not be relevant in issuing a no-knock

6  warrant knowing that the sale of marijuana consisted of less

7  than a gram?

8  **A.** Along with other factors, yes.

9  **Q.** What? Say that again.

10  **A.** Along with other factors.

11  **Q.** Okay. And you would agree with me that your claim of

12  threat to officer safety, that being that he was in possession

13  of guns, comes from a CI that there's no corroboration as to

14  his statements? Is that true?

15  **A.** You're asking me did I require corroboration of the CI's

16  statement?

17  **Q.** No. I just want you to admit that there is no

18  corroboration of this CI's statement that's listed in that

19  affidavit. Is that right?

20  **A.** I wouldn't expect to see it necessarily in this

21  affidavit --

22  **Q.** Okay.

23  **A.** -- for a lot of reasons. You don't want to burn a CI in

24  the middle of an investigation or, you know, until they, I

25  guess, complete their service, however you want to refer to

that.

**MS. NORDSTROM:** Okay. Tender the witness, Your Honor.

**THE COURT:** Okay, Mr. Mims.

**CROSS-EXAMINATION**

**BY MR. MIMS:**

**Q.** Good afternoon, Judge Prewitt.

**A.** Good evening.

**Q.** I'll try to be very brief. I just have a few questions for you. Ms. Nordstrom asked you a minute ago about -- in a statement about there's no corroboration as to the CI's statements. In fact, the affidavit references a controlled buy that was conducted under physical surveillance and audio/video capability surveillance; is that correct?

**A.** I believe it does, and that's typically how the police department would operate.

**Q.** Would you --

**A.** They're going to --

**Q.** I'm sorry.

**A.** Yeah. They're going to know -- you know, it's like lawyers knowing what the case is about before the judge does. You know, I mean, they're going to have seen something before they're going to, you know, call a judicial officer to have a warrant issued.

**Q.** Well, would you agree with me, based on the affidavit, the CI said he could buy drugs from Mr. Bryant, and then, in

1  fact, he did go and buy drugs from Mr. Bryant?  That would

2  corroborate his statement, wouldn't it?

3  **A.**    And I think he also said he could buy guns, but I

4  don't -- I don't think he said he bought one.

5  **Q.**    Right.  They didn't buy any guns from him.

6  **A.**    Not that I recall.

7  **Q.**    Now, Judge Prewitt, how long did you tell me you had been

8  a judge?

9  **A.**    About 22 years.

10 **Q.**    Okay.  When presented with search warrants by law

11 enforcement, do you review them closely before signing?

12 **A.**    I do.

13 **Q.**    And, in this particular case, did you review this search

14 warrant closely before signing?

15 **A.**    I consider myself reviewing every one closely -- every

16 search warrant closely before signing it.  I don't -- and,

17 again, I don't remember sitting down with the officer and going

18 over this, you know, piece by piece.  And these come at me at

19 different angles.  Honestly, I may get a phone call at 10:00 at

20 night.  I may be in a courtroom.  I may be in my office.  I

21 just don't remember -- have an independent recollection of

22 having a conversation about this warrant.

23 **Q.**    Let me ask you this question.  I'm going to ask it this

24 way.  Do you simply approve whatever law enforcement presents

25 to you?

1  **A.**    I wouldn't be doing my job if I did that, but, no, the

2  answer -- I'm sorry.  I don't mean to be a smart-ass.

3  **Q.**    That's okay.

4  **A.**    But, no.  I mean, you know, it's pretty embarrassing to

5  look up and someone thinks that you've signed something

6  authorizing a police officer to go in -- barnstorming in

7  somebody's house, you know, based on bad information or et

8  cetera.  And it happens.

9  **Q.**    Fair to say that on more than one occasion you have

10  rejected applications for search warrants or other arrest

11  warrants, for example, that law enforcement brings you because

12  you don't think there's sufficient probable cause to support

13  it?

14  **A.**    Oh, yeah.  I've been cussed out privately behind my back

15  for releasing some murder suspect or, you know, dismissing a

16  case.  I could show you a newspaper on my dining room table

17  right now that said that the judge dismissed a murder case, and

18  calls to his office went unanswered, and he didn't provide a

19  reason why I did it, as if I'm supposed to have that

20  conversation with the media, you know.  Everybody in the police

21  department knew why I did it.

22  **Q.**    Two more quick things.  Would you agree with me that the

23  sale of marijuana is illegal regardless of the amount?

24  **A.**    True.

25  **Q.**    In fact, it's a felony, regardless of the amount, to sell

1    it, correct?

2    **A.**   Yes.

3    **Q.**   Okay.  And do you consider the presence of firearms to

4    present a threat of physical violence?

5    **A.**   I do.

6            **MR. MIMS:**  Thank you.  No further questions, Your

7    Honor.

8            **THE COURT:**  All right.  I think we've covered this

9    area pretty thoroughly.  Do you have anything that hasn't been

10   already testified to?

11           **MS. NORDSTROM:**  Two questions.

12           **THE COURT:**  All right.

13           **MS. NORDSTROM:**  That's it, I promise.

14           **THE COURT:**  Based on what was put out on cross, you

15   may go into that only.

16           **THE WITNESS:**  And don't let me steal the court

17   reporter's exhibit before I get out of here.

18           **MS. NORDSTROM:**  Yeah.  Okay.  I'll come get it.

19                        **REDIRECT EXAMINATION**

20   BY MS. NORDSTROM:

21   **Q.**   Can you remember a single incident where a no-knock

22   search warrant was requested and you denied it?

23   **A.**   Not offhand.

24   **Q.**   Okay.

25   **A.**   I'm sure it has occurred, but I couldn't sit here under

1    oath and say on this day at that time, this property, et
2    cetera.
3              **MS. NORDSTROM**:  Okay.  No further questions.
4              **THE COURT**:  All right.  Judge Prewitt, you may step
5    down.
6              **THE WITNESS**:  Thank you, Your Honor.  May I be excused
7    from the subpoena?
8              **THE COURT**:  You may.
9              **THE WITNESS**:  All right.  Thank you, Your Honor.
10             **THE COURT**:  All right.  Is that all the witnesses?
11             **MS. NORDSTROM**:  It is, Your Honor.
12             **THE COURT**:  You don't have any witnesses, do you,
13   Mr. Mims?
14             **MR. MIMS**:  No, sir, Your Honor.
15             **THE COURT**:  Okay.  We're going to take a ten-minute
16   recess, and I'll hear what counsel have to say before we wrap
17   it up.  Be in recess for ten minutes.
18        (RECESS TAKEN.)
19             **THE COURT**:  Ms. Nordstrom, give me a brief summary of
20   what you think you've proved in this hearing.
21             **MS. NORDSTROM**:  Thank you, Judge.
22             First, I represent that the affidavit in this case was
23   insufficient for a search warrant because it did not allege a
24   valid exigent circumstance.  The Supreme Court has said there
25   is basically two, which is dangerousness and destruction.  The

1    courts have said, on dangerousness, there must be more than a

2    generalized statement around drug culture.  It cannot just say

3    dangerous and guns are tools of the trade.  You need a threat

4    or knowledge that a gun is always carried by the defendant and

5    the defendant is always armed, you know, something about his

6    violent criminal history.  None of that is alleged here.

7         In Mr. Bryant's case, with the dangerousness element,

8    the affidavit says that the CI said "I could purchase firearms

9    from him."  Investigator West said something somewhat different

10   on the stand.  Said that they didn't ask him to buy a gun from

11   Mr. Bryant because basically didn't think he could get one from

12   Mr. Bryant or something along those lines.  So that's a bit

13   misleading in the affidavit.  And said that he was in

14   possession of guns in his house, but he doesn't give any time

15   line of when he saw those guns.

16        There's nothing in the affidavit about Mr. Bryant's

17   criminal history.  Had it been in there, Mr. Prewitt said that

18   would be relevant.  His criminal history indicates receiving

19   stolen property was his last felony conviction, which was

20   eight years ago.  Nothing in there to indicate he's violent.

21        And then as to the destruction element, there was no

22   testimony as to there being any destruction of evidence.  And

23   generalized statements that guns and drugs -- that's not

24   enough.  There's *Bishop v. Arcuri*, a Fifth Circuit case,

25   674 F.3d 456.

1       And the next portion is whether the government has
2  gone above the good faith reliance.  There are exceptions to
3  the good faith, and one of those is whether Investigator West
4  can claim he objectively -- his objective reliance on the
5  warrant.  Investigator West must have believed that what he
6  wrote in the affidavit would be sufficient to support a finding
7  for no-knock.

8       He, you know, left out anything about Mr. Bryant's
9  criminal history, any specific facts about Mr. Bryant being a
10  threat.  He indicated that the witness told -- he never told
11  him that Mr. Bryant has threatened him, never told him that
12  Mr. Bryant always has a gun with him, nothing about him being
13  threatening.

14       And the other one, the other factor that good faith
15  does not -- cannot apply is when, factor two, where the issuing
16  magistrate judge wholly abandons his or her judicial role.  I
17  call that rubber stamping.  And although Judge Prewitt did not
18  say that he rubber stamps, I believe the testimony indicates
19  that he does.  He testified that "If there's a sweater in the
20  house, I have the right to ask for a no-knock search warrant."
21  He said more than usual, more than -- more often than not.

22       **THE COURT:**  You mean he has the right to issue a
23  no-knock?

24       **MS. NORDSTROM:**  Correct.

25       **THE COURT:**  Not ask for one.

1    **MS. NORDSTROM:** Right, to grant a no-knock search
2    warrant. If he thinks there's a sweater that has been stolen
3    and in his house, he can issue -- he can grant a no-knock
4    search warrant. He testified that more often than not he
5    issued -- if a no-knock is requested, he grants it, especially
6    in narcotics cases.

7    And the whole factor -- the exigent circumstances on
8    the dangerousness aspect, it was all on a CI's statement.
9    There's been no independent investigation as to those
10   allegations of buys. They didn't ask him to go in and buy a
11   gun from him. They simply went on that statement. And Judge
12   Prewitt said that he, you know, has no idea if he asked
13   anything about the veracity of the confidential informant. In
14   fact, he doesn't remember anything about the case.

15   But I brought this to the Court's attention because we
16   have seen in our office with Greenville Police Department that
17   no-knock search warrants are happening all the time. We pulled
18   ten cases involving Greenville Police Department, involving
19   this judge, involving the sale of narcotics, and in each one a
20   no-knock search warrant is issued.

21   And this is -- it's a problem, and it is -- something
22   is going to happen with the nexus of you having the right to
23   self-defend your home and your family with the intrusion of the
24   government at your front door. And let's -- when we say
25   no-knock, what we are saying is, this is the government

1  breaking and entering into homes, destroying personal property.

2  And for that reason, Judge, we brought this to the

3  Court's attention.  It is -- there is no good faith here.  This

4  is being -- this is dangerous in what they are performing in

5  Greenville.  And for that, Judge, we ask that this -- that the

6  motion to suppress be granted and that -- and thank you.

7  **THE COURT**:  One thing that struck my mind about this

8  testimony was whether the police waited too much time to elapse

9  from the time they got the warrant until the time they execute

10  it.  That has to be done within a reasonable period of time.

11  I'm sure Mr. Mims wants to say something about that.  But I

12  think they asked for the warrant on the 11th, but they held it

13  until the 17th.

14  **MS. NORDSTROM**:  That's correct.

15  **THE COURT**:  What do you have to say about that?

16  **MS. NORDSTROM**:  Well, you know, one of the

17  requirements of a no-knock search warrant is there has to be

18  exigent circumstances.  So exigent means urgent.  And, yeah,

19  waiting six days doesn't seem very urgent to me.

20  I do believe there is a state statute on serving

21  search warrants.  There actually is no no-knock search warrant

22  statute in Mississippi.  It's actually been repealed, so there

23  is none.  But the Supreme Court says you can have a no-knock

24  search warrant with exigent circumstances, but I believe it

25  says it has to be done within ten days.  I believe that's

1  right.  So I did look into that, Judge.

2          **THE COURT:**  Okay.  Thank you.

3          Mr. Mims.

4          **MR. MIMS**:  Your Honor, first of all, I want to address

5  a couple of things Ms. Nordstrom stated.  First of all, she

6  said that a no-knock search warrant requires exigent

7  circumstances.  That is simply not true.  I think she's just

8  mistaken on her legal terms.

9          A no-knock search warrant requires -- and this is

10  based on the Supreme Court case of *Hudson v. Michigan.*  "To

11  knock and announce is not necessary when circumstances present

12  a threat of physical violence, if there is reason to believe

13  that evidence will likely be destroyed if advance notice were

14  given, or if knocking and announcing would be futile."  None of

15  that has to do with exigent circumstances.  That's a whole

16  separate issue.

17          As far as the time delay, I should have asked Sergeant

18  West about this.  I neglected to do it.  I know in addressing

19  this issue with either Sergeant West or one of the other

20  officers of Greenville the other day on the matter, they have

21  up to -- it's either seven days or ten days to execute the

22  search warrant.  It doesn't mean they always wait that long.

23  There's various reasons, though, why they don't necessarily go

24  immediately and execute it, but they have either seven days or

25  ten days to do it, and they're within that time frame here.

1    One other statement Ms. Nordstrom made was, she said
2  that all this is based strictly on the CI's statement.  That is
3  simply not true, Your Honor.  They got a statement from the CI
4  that basically Mr. Bryant sells guns and drugs.  Now, there's
5  some question as to could the CI buy guns from Mr. Bryant or
6  not.  It doesn't really matter.  The point of that issue is
7  that he's selling guns out of his house.

8    That -- the law enforcement did not rely strictly on
9  that statement.  They did not ask Judge Prewitt to rely
10  strictly on the CI's statement as to the basis for issuing the
11  search warrant.  They, in fact, corroborated the CI's statement
12  by setting up a controlled buy to show that, yes, in fact, the
13  CI is telling the truth because we went and bought drugs from
14  Mr. Bryant.  That's the basis for the search warrant.

15    I think there's certainly an arguable basis in this
16  case that at least one of the factors for a no-knock was
17  present, and all you have to have is one.  As the Supreme Court
18  has said, "You only have to have a reasonable suspicion that
19  one of these grounds exists, and the required showing of
20  reasonableness is not high."

21    When there's evidence in the affidavit that Mr. Bryant
22  is selling -- selling guns out of the house, I believe guns
23  present a threat of physical violence.  There's nothing that
24  says it has to be a threat to the CI or that law enforcement
25  has been threatened.  The law simply says a threat of physical

1    violence.  Guns present a threat of physical violence.

2            But more importantly than that, Your Honor, even if in
3    hindsight we can sit in here and say maybe that search warrant
4    should not have been issued, you may look back on your state
5    court days and say, "When I was a state court judge, I would
6    not have issued that search warrant."  That's fine.  The
7    question in my mind here is did Sergeant West and his
8    colleagues with Greenville PD have a good faith basis to rely
9    upon that.

10           As the case law says, "When a search warrant is issued
11   by a detached and neutral magistrate, law enforcement has --
12   has a right to rely upon that unless one of these four
13   exceptions exist."  In this case, Your Honor, the exceptions
14   just don't exist.

15           The only two things that Ms. Nordstrom has really
16   argued is she wants to argue about the language in the
17   affidavit, as to whether -- whether the CI could buy guns from
18   Mr. Bryant or whether the CI just said Mr. Bryant sells guns
19   and whether that wording is important.  It's not important in
20   this case.  It's not misleading.  It's not untruthful, not in
21   any relevant and -- I can't think of the legal term for it, but
22   not in any material way is the word I'm looking for.

23           The other thing Ms. Nordstrom talks about -- and this
24   is their key argument here -- is they basically say the issuing
25   judge wholly abandoned his or her judicial role.  That's

1    certainly their spin on this.  They have apparently

2    cherry-picked ten search warrants from down in Greenville and

3    said, "Well, they all are no-knocks and they've all been

4    approved, so they must do it in every case."

5           **THE COURT:**  Now, wait a minute.  You said they

6    cherry-picked them.  I understood that these were all of the

7    search warrants.

8           **MR. MIMS:**  No, sir.  I've handled -- I have prosecuted

9    probably 30 or 40 people from Greenville in the last couple --

10   two or three years myself, and I have probably had close to ten

11   that are based on no-knocks, and I only handle a small fraction

12   of cases out of Greenville.  Most of them are brought locally

13   through the state.  So they didn't collect the whole -- every

14   search warrant that has been issued.  They went and grabbed ten

15   of them and said, "Well, here's ten that have been issued that

16   are no-knocks, they must do all of them that way."

17          The evidence from the witness stand from both Judge

18   Prewitt and from Sergeant West are Judge Prewitt does not

19   approve everything brought to him.  He looks at it carefully.

20   And he said, "I reject things all the time because the probable

21   cause isn't there."  Sergeant West said, "I know of at least

22   one occasion he's rejected a search warrant of mine, and

23   there's been other times on arrest warrants he's rejected

24   things I've presented him."  He doesn't just rubber stamp

25   whatever is brought to him.

1        What you have, in fact, though, you have an

2   experienced officer who's learning -- every time he brings

3   something to the judge, he learns from it, just like he's in

4   here today watching and learning how he can be a better officer

5   in here.  And so over time, and with his training, yes, he

6   presents search warrants that he believes are valid to this

7   judge, and this judge accepts them because he's learned what

8   the judge is looking for and what constitutes probable cause.

9        But that's certainly not evidence that the judge is

10  rubber stamping whatever is brought to him.  The evidence is,

11  he doesn't.  He does reject things sometimes when the judge

12  doesn't believe it's there.  And this officer had every good

13  faith basis to rely on the search warrant signed by this

14  magistrate (sic) judge.

15       And so, regardless of whether in hindsight we look at

16  this and say a no-knock should or should not have been issued,

17  the fact of the matter is, the good faith reliance exception

18  protects the officer and, frankly, the prosecution in this case

19  to be able to go forward with this evidence.

20       **THE COURT:**  Do you recall a case that this U.S.

21  Attorney's Office had which you referred to another -- because

22  of some conflict that you had, you referred it to another U.S.

23  Attorney's Office in another district?

24       **MR. MIMS:**  I --

25       **THE COURT:**  And they -- I don't know if you were

1 involved in the case, but this U.S. Attorney's Office was.

2       **MR. MIMS**:  Yes, sir.

3       **THE COURT**:  And they were so slow in prosecuting the

4 case that the probable cause for the case was stale, and they

5 said they couldn't use it anymore.  Do you --

6       **MR. MIMS**:  I don't recall that, Your Honor.  I was not

7 involved in it.  It certainly doesn't surprise me.  I know

8 there's been times when that sort of thing has probably

9 happened.

10       **THE COURT**:  Yeah.  Well, it happened in that case.

11       **MR. MIMS**:  Yes, sir.

12       **THE COURT**:  And because of the state statute -- what

13 is the requirement for there to be a contemporaneous nexus

14 between applying for the warrant or issuing of the warrant and

15 the execution of the warrant?  That's not going to be based on

16 some state law.

17       **MR. MIMS**:  No, sir.  To be honest, I haven't looked at

18 that because I don't -- I'm not a state court prosecutor, and

19 so I don't look at that.  I know that, obviously, the facts --

20 when you bring a search warrant, your affidavit has to be based

21 upon contemporaneous facts.  You can't go too far back in time.

22       Typically what we see, and in this case in particular,

23 their controlled buy was within a day or two of seeking the

24 search warrant, so your evidence that you're basing the search

25 warrant on is fresh.  Now, as far as when they execute it,

1  again, my recollection from talking to them is it's either

2  seven days or ten days they have to execute it.  And where that

3  comes from, I don't know.

4         Ms. Nordstrom, I think, referenced a state statute.

5  That may be where it comes from.  I've never looked at that.  I

6  take her word for it.  I do know that's consistent with what

7  the officers have told me, and that's what they did in this

8  case, and they're within the statute.

9         **THE COURT:**  Well, within the state statute?

10        **MR. MIMS:**  Yes, sir, as far as how long they have to

11  go execute that warrant.

12        That's really all I have, Your Honor.  It's just

13  mainly I'm relying upon the good faith exception.

14        **THE COURT:**  Okay.  All right.  I appreciate your

15  information, and I will take this matter under advisement and

16  issue an opinion on it shortly.  Thank you.

17        **MS. NORDSTROM:**  Thank you, Judge.

18        **THE COURT:**  We'll be in recess.

19        (CONCLUDED AT 5:20 P.M.)

20

21

22

23

24

25

1                              CERTIFICATE

2

3          I, Phyllis K. McLarty, Federal Official Realtime Court

4    Reporter, in and for the United States District Court for the

5    Northern District of Mississippi, do hereby certify that

6    pursuant to Section 753, Title 28, United States Code, that the

7    foregoing 86 pages are a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12          Witness my hand, this 22nd day of July, 2021.

13

14                          /s/ Phyllis K. McLarty
                            PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
                            Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25